## ENGINEERS PUBLIC SERVICE CO. et al. v. SECURITIES AND EXCHANGE COMMISSION.

No. 8394.

United States Court of Appeals. District of Columbia.

Decided Nov. 22, 1943.

SOPER, Circuit Judge, dissenting in part.

Messrs. William E. Tucker, of New York City, and T. Justin Moore, of Richmond, Va., with whom Messrs. Paul D. Miller, of New York City, and George D. Gibson, of Richmond, Va., were on the brief, for petitioners.

Mr. Milton V. Freeman, of Philadelphia, Pa., pro hac vice, by special leave of Court, with whom Mr. John F. Davis, Solicitor, Securities and Exchange Commission, of Philadelphia, Pa., was on the brief, for respondent.

Before SOPER and ALBERT LEE STEPHENS, Circuit Judges, sitting by designation, and MILLER, Associate Justice.

SOPER, Circuit Judge.

This petition, filed under § 24 of the Public Utility Holding Company Act of August 26, 1935, 49 Stat. 803, 15 U.S.C.A. § 79x, seeks a review of an order issued by the Securities and Exchange Commission on September 16, 1942, in a proceeding begun February 28, 1940, under § 11(b) (1) of the Act, 15 U.S.C.A. § 79k(b) (1), whereby Engineers Public Service Company was ordered to divest itself of ownership and control of certain subsidiary corporations, and was allowed to retain as its principal system the electric utility system of the Virginia Electric and Power Company, with leave to petition within fifteen days for leave to retain as its principal system the electric utility system of the Gulf States Utilities Company instead of that of Virginia. By additional order of October 6, 1943, Engineers' petition for rehearing and leave to adduce additional evidence was denied except that the fifteen day period was allowed to run from the last mentioned date. The petition for review also covers this order.

Engineers was incorporated in Delaware in 1925 and has its principal offices in New York City. It is a registered holding company under § 5 of the Public Utility Holding Company Act, 15 U.S.C.A. § 79e. Prior to the divestment order of September 16, 1942 the Commission had passed a divestment order on July 23, 1941 and Engineers had taken certain steps to comply therewith. Disregarding the properties dealt with in the earlier order, Engineers, through stock ownership, controlled the following companies on September 16, 1942:

*Virginia Electric and Power Company:*

This company, referred to herein as "Virginia", carries on an electric utility business in Virginia and North Carolina, and a gas utility, a street railway, a bus and an ice business in Virginia.

*Savannah Electric and Power Company:*

This company, referred to herein as "Savannah", carries on an electric utility and a street railway and bus business in Georgia.

*Gulf States Utilities Company:*

This company, referred to herein as "Gulf States", carries on an electric utility and a steam and water business in Texas and Louisiana, a gas utility business in Louisiana and an ice business in Texas.

*Baton Rouge Bus Company, Inc.:*

This company, referred to herein as "Baton Rouge Bus" carries on a bus business in Baton Rouge, Louisiana.

*El Paso Electric Company (Delaware):*

This company is also a registered holding company and controls through stock ownership (a) El Paso Electric Company (Texas), referred to herein as "El Paso", which is an electric utility, operating in Texas and New Mexico, and owns a street railway and bus business operating in El Paso, Texas, and the American half of two international toll bridges between El Paso, Texas, and Juarez, Mexico, and (b) El Paso and Juarez Traction Company, which owns a street railway in Juarez, Mexico, and the Mexican half of said international toll bridges.

The subsidiaries of Engineers, in amounts approximately proportionate to their respective gross earnings, hold stock control of Engineers Public Service Company, Inc., a mutual service company organized and having its executive offices in New York.

Engineers also owns a minority stock interest in El Paso Natural Gas Company.

Virginia, Savannah, Gulf States and El Paso also carry on electric merchandising and jobbing businesses, and Virginia and Gulf States carry on gas merchandising and jobbing businesses.

Thus it appears that Engineers controls gas and electric utility companies which serve widely scattered sections of the country. Electric service is furnished in Virginia, North Carolina, Georgia, Louisiana, Texas and New Mexico. Gas service is rendered in Virginia and Louisiana by the subsidiaries which render electric service in those states. The subsidiary companies in the system also engage in various other businesses such as bus and street railway systems, interurban and suburban transportation lines, toll bridges, ice and cold storage plants and various water and steam enterprises.

The principal subsidaries, in the order of their importance measured by net income in 1940, are Virginia, Gulf States and El Paso. On December 31, 1940, prior to the divestment order of July 23, 1941, the book value of Engineers' assets was $375,000,000.

Engineers exercises active control over its subsidiaries by virtue of its voting power. It elects the Boards of Directors, designates and transfers executive officers; and through the Service Company, it arranges for the financing of its subsidiaries, negotiates their loans and sales of securities, reviews the contents of their reports to regulatory bodies and tax authorities, and prepares and distributes reports for the stockholders and general publication.

By its order of September 16, 1942 the Commission required Engineers within one year (1) to dispose of its interest in the following companies: Savannah, Gulf States, Baton Rouge Bus, El Paso Electric Company (Delaware), El Paso Electric Company (Texas), El Paso and Juarez Traction Company, El Paso Natural Gas Company and Engineers Public Service Company, Inc.; and (2) to cease to own or operate any property now owned or operated through Virginia Electric & Power Company for the purpose of conducting any gas utility, gas appliance merchandising and jobbing, and transportation businesses.

The order also required (1) El Paso Electric Company (Delaware) to dispose of its interest in El Paso and Juarez Traction Company; (2) to cease to own or operate any facilities now owned or operated by it through El Paso Electric Company (Texas) for the purpose of conducting any transportation or toll bridge business.

The order gave the Engineers the right within 15 days to petition for leave to retain as its principal system the electric utility system of Gulf States.

It will be perceived that under the order Engineers was ordered to rid itself of all its holdings except Virginia; and Virginia was ordered to rid itself of its gas utility, gas appliance merchandising and jobbing business, and also its transportation business. The holdings that Virginia was permitted to retain consisted of the Virginia Electric and Power Company, its electric appliance merchandising and jobbing business and its ice business.

Engineers contends that the order of the Commission is invalid because (1) it is based upon an erroneous interpretation of the Act; (2) it impeded the Engineers in the selection of the principal system to be retained; (3) the statute is unconstitutional when considered in the light of evidence rejected by the Commission which shows that the divestment provisions of the statute are arbitrary and capricious in that they have no substantial relation to the evils which Congress desired to eliminate.

*Interpretation of Section 11(b) (1) of the Statute.*

The character and content of the order of September 16, 1942, were influenced by the Commission's interpretation of the provisions for the simplification of holding company systems contained in § 11(b) (1) of the Act.

Section 11(a) and (b) are as follows:

"*Simplification of holding company systems*—* * *.

"Sec. 11(a) It shall be the duty of the Commission to examine the corporate structure of every registered holding company and subsidiary company thereof, the relationships among the companies in the holding-company system of every such company and the character of the interests thereof and the properties owned or controlled thereby to determine the extent to which the corporate structure of such holding-company system and the companies therein may be simplified, unnecessary complexities therein eliminated, voting power fairly and equitably distributed among the holders of securities thereof, and the properties and business thereof confined to those necessary or appropriate to the operations of an integrated public-utility system. * * *

"(b) It shall be the duty of the Commission, as soon as practicable after January 1, 1938:

"(1) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such action as the Commission shall find necessary to limit the operations of the holding-company system of which such company is a part to a single integrated public-utility system, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system: Provided, however, That the Commission shall permit a registered holding company to continue to control one or more additional integrated public-utility systems, if, after notice and opportunity for hearing, it finds that—

"(A) Each of such additional systems cannot be operated as an independent system without the loss of substantial economies which can be secured by the retention

of control by such holding company of such system;

"(B) All of such additional systems are located in one State, or in adjoining States, or in a contiguous foreign country; and

"(C) The continued combination of such systems under the control of such holding company is not so large (considering the state of the art and the area or region affected) as to impair the advantages of localized management, efficient operation, or the effectiveness of regulation.

"The Commission may permit as reasonably incidental, or economically necessary or appropriate to the operations of one or more integrated public-utility systems the retention of an interest in any business (other than the business of a public-utility company as such) which the Commission shall find necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of such system or systems."

It is the duty of the Commission under this section to examine the corporate structure of every registered holding company and its subsidiaries, the relationships among them, and the interests and properties thereof, in order to determine to what extent the corporate structure of the system may be simplified and the properties and business confined to those necessary or appropriate to the operation of an integrated public utility system. As applied to the electric utility companies, such a system is defined in § 2(a) (29) of the Act, 15 U.S.C.A. § 79b (a) (29), to mean a system consisting of generating plants and distributing facilities, whose assets are physically interconnected and may be economically operated as a single system confined in its operations in a single area or region in one or more States, and not so large as to impair the advantages of localized management and efficient operation and regulation. As applied to gas utility companies, such a system means a system consisting of one or more gas utility companies, so located and related that substantial economies may be effectuated in a single coordinated system confined in its operations to a single area or region in one or more States, and not so large as to impair the advantages of localized management and efficient operation and regulation.

The duty is imposed upon the Commission to require each registered holding company and each subsidiary thereof to limit the operations of the system to a single integrated public utility system "and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system." But the duty and power of the Commission to simplify holding company systems is limited by the proviso that the Commission shall permit a holding company to continue to control "one or more additional integrated public-utility systems" if the Commission finds that the additional systems conform to the terms of paragraphs (A), (B) and (C) of the section. Moreover, the Commission is directed, when determining whether other businesses are reasonably incidental or economically necessary or appropriate to the operation of the system, to permit "the retention of an interest in any business (other than the business of a public-utility company as such)[1] which the Commission shall find necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of such system or systems."

It is the interpretation which the Commission has placed upon these limitations upon its power that is the subject of dispute, particularly the meaning attributed by the Commission to paragraph (B) relating to the location of additional systems permitted by the Act, and the meaning attributed by the Commission to the final sentence of the section relating to the retention in a system of businesses other than the business of a public utility company. For example, the Commission held that if Engineers chose to retain Virginia as its principal integrated system, it could not also retain Gulf States because the Gulf States properties are not in Virginia or in States adjoining thereto; and that Virginia could not retain the street railway and bus transportation businesses in Virginia and adjoining States because they were not functionally related to its electric utility business.

*Additional Integrated Public-Utility Systems.*

It is clear that the Commission must permit a holding company to continue to

1 The term "public-utility company" as used in the act means an electric utility company or a gas utility company, § 2(a) (5), 15 U.S.C.A. § 79b (a) (5).

control one or more integrated public utility systems in addition to its principal system, if the Commission finds that the additional systems conform to the standards of economy of operation, geographical locality and size, set out in Paragraphs (A), (B) and (C) of the section substantially as follows: (A) Each additional system cannot be operated independently without the loss of substantial economies; (B) all of such additional systems are located in one State, or in adjoining States, or in a contiguous foreign country; and (C) the continued combination of such systems under one control is not so large as to impair the advantages of localized management, efficient operation, or effectiveness of regulation.

The Commission considered this matter in connection with its order of July 23, 1941, and stated in its opinion at that time that the dominant question was the proper interpretation of the geographical requirements of paragraph (B). Consequently, consideration was limited to this paragraph without receiving evidence as to the bearing of paragraphs (A) and (C) upon the business and properties of Engineers which do not lie in the same State as the principal system or in States adjoining thereto. The Commission reached the conclusion that paragraph (B) should be interpreted to mean that the additional systems must not only be located in one State, or in adjoining States or in a contiguous foreign country, but also in the *same* State with the principal system, or in a contiguous foreign country. In other words, the Commission gave paragraph (B) the same meaning as if it read: "All of such additional systems are located in the same State as the principal system or in adjoining States or in a contiguous foreign country"; or, as the Commission itself said, paragraph (B) should be construed as if it read: "(B) All of such additional systems are located in a State *in which the single integrated public utility system operates,* or in States adjoining such a State, or in a foreign country contiguous thereto."

It is contended by the holding company that the text of the statute does not support this exegesis because the provision is that all the *additional* systems shall be located in *one* State, and not that all the systems, principal and additional, shall be located in one State or the same States; and it is suggested that the incongruities that would result from the association of systems far removed from one another under the two area interpretation would be obviated by applying standards (A) and (C) which preclude the retention of additional systems unless the Commission itself finds that they are needed to effectuate substantial economies and are not so large as to impair the advantages of localized management, efficient operation or the effectiveness of regulation.

The one area interpretation adopted by the Commission depends upon the legislative history of the Act and the general purposes therein expressed. The bill originally passed by the Senate required the complete elimination of a holding company unless it could be continued as a first degree holding company, and unless the Federal Power Commission should issue a certificate that continuance was necessary for the operations of a geographical and economically integrated public utility system serving an economic region in a single State or extending into two or more contiguous States, or into a contiguous foreign country. The House modified this provision and substituted a direction that the Securities and Exchange Commission should require each holding company and its subsidiaries to limit their operations to a single integrated public utility system; except that if the Commission should find that it is not necessary in the public interest to so limit the operations of the holding company system, the order of the Commission should require the company to take only such action as the Commission should find necessary to limit the operations to such number of integrated public utility systems as might be consistent with the public interest. The basic divergence between the two bills was that the Senate bill limited the retainable systems to those serving a single economic region while the House permitted the retention of as many systems, regardless of location, as the Commission might find to be consistent with the public interest. The present act was worked out as a compromise by conferees who pointed out that it was less rigid than the Senate bill and less flexible than that of the House. The Conference Report (H. R. Rep. No. 1903, 74th Cong., 1st Session, pp. 70–76) contained the following paragraph which, in the Commission's view, sustains its argument: "The substitute, therefore, makes provision to meet the situation where a holding company can show a real economic

need on the part of additional integrated systems for permitting the holding company to keep these additional systems under localized management with a principal integrated system. Under such circumstances the Commission is directed to permit the holding company to retain control of such additional systems, even though not physically integrated with the principal system, provided all such integrated systems are located in the same State or States, or in adjoining States or a contiguous foreign country."

The Commission also relies upon the comments of certain representatives in Congress during the passage of the bill upon the effect of the Conference Report; and more particularly upon an address in the Senate by Senator Wheeler, one of the conferees, immediately after the passage of the Act in its present form and before its approval by the President in which the Senator, commenting upon paragraphs (A), (B) and (C), interpreted paragraph (B) to mean that the additional systems must be in the same region as the principal system. 79 Cong. Rec. 14166–14167, 14168, 14479.

The matter is not free from doubt but in our view the interpretation of the Commission is correct. The quoted passage from the Conference Report speaks in sequence of "additional integrated systems", "these additional systems", "a principal integrated system", "such additional systems", and concludes with the proviso that "all such integrated systems are located in the same State or States, or in adjoining States". This final clause is broad enough to include both the previously mentioned "principal integrated system" and also the "additional systems", and it is a weighty circumstance that this meaning was publicly attributed to paragraph (B) in the Senate by one of the conferees before the present controversy had arisen.

Persuasive also are the irrational and incongruous consequences that would flow from the two area interpretation as may be illustrated by its application to the properties in the Engineers' system. It would be possible for the holding company to retain widely separated and totally unrelated properties under one control, as by selecting Virginia Electric & Power Company, located in Virginia and North Carolina, as the principal single integrated system, and associating therewith as additional integrated systems, Gulf States and El Paso, located in Louisiana, Texas and New Mexico, notwithstanding the entire absence of operational relationship or normal common interests between them. And, if this choice were made, Virginia could not retain control of the Virginia gas system or of any other system located in Virginia or its adjoining States because these States do not adjoin Louisiana and Texas or New Mexico. It is true that the one area interpretation seems also to lead to certain inequalities since it restricts the permissible area covered by a principal and additional systems more severely when the principal system is located in a State, such as Maine, which has few adjoining States than it does in a State like Missouri to which eight States are contiguous. But, it must be remembered that in the latter situation all the additional systems submitted for retention, which in theory might be very numerous, would be retainable in actual practice only if it could be shown to the satisfaction of the Commission that they also comply with standards (A) and (B). This condition actually confronted Engineers in the pending case when it was held that it could not retain control of Savannah Electric & Power Company of Georgia as an additional system to Virginia Electric & Power Company, located in the adjoining States of Virginia and North Carolina, because it was not shown that Savannah could not be operated independently without substantial loss of economies as required by paragraph (A).

It is clear from paragraphs (A) and (C) that Congress deemed it desirable and wise to prohibit combinations of systems that produce no economy of operation, or are so large as to impair the advantages of local management, efficient operation and effectiveness of regulation. The same idea is found in more general terms in various portions of § 1 of the Act which declares, among other things, that all provisions of the Act shall be interpreted so as to meet the problems and eliminate certain enumerated evils connected with public utility holding companies, among which are those which result from the growth and extension of holding companies which bear no relation to economy of management and operation or the integration of related operating properties. § 1(b) (4); § 1(c). Obviously the Act was designed to eliminate the difficulties and complexities that attend the investor, the consumer and the State authorities when dealing with sub-

sidiary public utility companies in different States; § 1(b) (1), (3), (5); and these provisions in themselves, as well as the Congressional debates, show beyond question that among the prime purposes in view was the reduction in size and complexity of holding company systems. It follows that the order of September 16, 1942, should be sustained insofar as it requires Engineers, assuming Virginia to be the principal system, to divest itself of such additional systems as Gulf States and El Paso, which are not located in the State of Virginia or States adjoining thereto.

*Savannah Electric & Power Company as an Additional System.*

There are, however, other systems which satisfy the one area interpretation of paragraph (B) as additional systems, if Virginia be considered the principal system, because they are located in the State of Virginia or in adjoining States. Thus, Savannah Electric & Power Company qualifies under paragraph (B) because it is located in Georgia, and Virginia Electric and Power Company is located in Virginia and in North Carolina, that adjoins Georgia. But, Savannah serves only the City of Savannah and its suburbs, which are surrounded by a marshy uninhabited area and its electric system is located 315 miles distant from the electric system of Virginia at the closest point and 550 miles distant at the farthest point, and there is no operational relationship between them. Hence the Commission found that Savannah did not comply with the standard of substantial economy set up by paragraph (A), or the standard of size in respect to the advantages of localized management and efficient operation set up by paragraph (C); and no complaint of these determinations is made by Engineers in the presentation of its petition for review.

*Virginia Gas System as an Additional System.*

Objection is made, however, to the ruling of the Commission that Virginia divest itself of its gas system (held by the Commission to be an integrated public utility system under § 2(a) (29) (B)), because it is not shown that its severance would result in the loss of substantial economies, as required by paragraph (A) of § 11(b) (1). The gas system serves an area of 35 square miles in Norfolk and its environs, and has been operated in combination with Virginia Electric properties under joint control since 1900. Engineers acquired the properties in 1925. The combination consists of a gas property of the book value of approximately $6,000,000, with electric properties of the book value of approximately $68,000,000. The gross revenues are approximately $1,000,000 and $15,000,000 respectively. Long operation under single ownership has resulted in certain economies in the joint use of personnel and property. There are 387 employees who work for the gas and other businesses in the combination, and property valued at $2,178,013, including office buildings, equipment, store rooms, automobiles and trucks is jointly used. Interdepartmental activities include the sale of gas and electricity, free transportation of employees and free advertising in street cars and buses.

The economies which would be lost by severance are in two classes: (1) Actual expenses now allocated to the gas property which would have to be paid by the electric properties even after separation; and (2) increased cost of operations of the gas properties as an independent business. The economies in the first class are chiefly caused by the joint use of personnel and property and amount to $55,969 annually; and this figure is not questioned by the Commission. The economies in the second class which would be lost by separation were arrived at by comparing the present costs of operation allocated to the gas properties with the estimated cost of an independent gas system. This estimate was prepared by executives of Virginia and no countervailing evidence was offered. The estimate of increased expenses was $71,522 annually as to which the Commission said that the record would not sustain the finding of more than one-half the amount. This would be equivalent to an increase of 4.6 per cent in the 1940 gas operating expenses and a decrease of 13.3 per cent in the gross gas income, and 29.8 per cent in the gas income available for dividends in that year.

The Commission concluded that this loss of economies was not "substantial" within the meaning of paragraph (A). It said that the Act does not permit a retention of additional systems "unless there is clear and convincing evidence of a loss of economies which would seriously impair the effective operations of the systems involved." It also adverted to the possibility that the increased cost of a separate staff for the gas properties might be offset by

increased income resulting from the activities of full time employees completely loyal to the interests of the gas business as distinguished from the competing electric business.

*Majority Opinion on Retention of Virginia Gas System as an Additional System.*

Coming now to the exact situation before us, we must determine whether or not the facts as they were revealed at the hearing give reasonable support to the Commission's conclusion that "substantial economies" would not be saved to "Virginia Gas" by reason of "Virginia Electric's" continued control of the former.

"Substantial economies", means something different and, we think, something more than substantial savings in operational expenses. Congress could have said that the divorcement shall not be decreed if the controlling utility or the controlled utility show at a hearing that the cost to operate the latter separately from the former would be substantially greater. If the Act can be construed as meaning just that, then the severance ordered here is wrong. "Substantial economies" must mean, as was said in North American Co. v. Securities and Exchange Commission, 2 Cir., 133 F.2d 148, 152, "important economies." The required *importance* must relate to the healthful continuing business and service of the freed utility. But Congress was not so much concerned with the profit motive of utilities as with the evils that had become prevalent through combinations of utilities. It was first concerned with the wiping out of the evils which the practice of utility combinations had produced, and Congress only consented to dull the blade of its chosen weapon in proved hard cases.

It seems clear that the Commission understood its duty when it required a clear and convincing showing that the operational savings through combination would be sufficient to support a finding that such single item of saving would constitute an overall substantial economy. In the circumstances of this case such a finding would have to be based upon the premise that the utility when freed from its controller would go forward upon its own bottom as an independent medium for the serving of a commodity in general demand without change in policy, serving practically in the same way, making practically the same gains, suffering practically the same losses. Here is a broad field, as it seems to us, that was within the area of the required showing by the petitioner. It would be rash to assume that so important an event as the freedom of a corporation from the ownership and control of another corporation engaged in a business to some extent intercompetitive, would not affect the business in anywise.

The evidence produced at the hearing by the petitioners went in its practical entirety to the operational expenses of "Virginia Gas" under "Virginia Electric's" control and as they would be after separation of these two utilities. This, no doubt, was proper evidence but was not conclusive of the issue.

It is our belief that the Commission could not legally "permit" the continued control of "Virginia Gas" by "Virginia Electric" unless it could be found from the evidence adduced at the hearing:

(a) That there would be a continuing substantial strength, enjoyed by the controlled company which it would not have under its own control.

(b) That there would be in the situation no reasonable expectation that a compensating strength would not be enjoyed by reason of its own control.

(c) That such continuing strength would not entail a sacrifice upon the part of the controlling utility.

In short, we are of the opinion that the mere showing of a material saving in operational expense (which, to some extent at least, would normally be expected) does not necessarily show the overall situation. This single item may or may not indicate a net economy of any figure. In the circumstances we cannot hold as error the Commission's finding that the divestment of "Virginia Gas" from "Virginia Electric" would cause a substantial loss to "Virginia Gas".

*Minority Opinion on Retention of Virginia Gas System as an Additional System.*

The majority opinion on this subject does not seem to give sufficient effect to the obvious intent of Congress to protect an established association of public utility systems under common control when it is found to satisfy the standards of substantial economy, restricted geographic location and moderate size described in paragraphs A, B and C respectively of § 11(b)(1). It is the opinion of the writer that the Commission is directed by the statute to

give as much weight to these paragraphs as to the provisions of the section immediately preceding, which require the limitation of the holding company system to a single integrated system with certain additions. This conclusion is reasonable because the evils which the statute was designed to eradicate do not prevail under the conditions described in the lettered paragraphs; and it is certain, as the legislative history shows, that the Act would not have received the approval of Congress if it had not contained the provisions which prohibit the unnecessary disturbance of existing conditions.

If the terms of paragraph (A) are given normal meaning and weight, it is hard to understand why substantial savings in operational expenses do not amount to the "substantial economies" upon which the application of the paragraph depends. The findings of fact by the Commission are of course conclusive, if supported by substantial evidence, § 24; but in this instance the evidence is undisputed and it remains only to decide whether a loss of substantial economies would result from a severance of the two systems. It is putting it too strongly to say, as the Commission did, that there must be clear and convincing evidence of loss of economies which would seriously impair the efficiency of the systems. The Act does not require more than a preponderance of evidence to support such a finding; nor does it require that the economies must be so great that their loss would seriously impair the system. Such a loss would not be merely susbtantial; it would be destructive.

A loss of substantial economies occurs if they are so large that experienced men of affairs would regard them as substantial and if possible, take steps to eliminate them. An annual loss of $91,730, that is $55,969 plus one-half of $71,522, even in a business as large as that of Virginia Electric & Power Company, would meet this test and the unnecessary toleration of such a loss by management would subject it to justifiable criticism by investors and by state authorities charged with the duty to protect consumers from unnecessary expense. The intent to protect investors and consumers is shown by the concluding sentence of § 11 (b) (1), and it is evident that Congress had the same idea in mind in its reference to substantial economies in paragraph (A) as it did in the last sentence when it directed the Commission, under certain circumstances, to permit the retention of other businesses as economically necessary or appropriate to the operations of an integrated system if found necessary or appropriate for the protection of investors or consumers.

The conjecture of the Commission that compensating advantages might result from separate management adds no weight to the findings, for the sufficient reason that it is entirely without support in the evidence. No one in the present case questions the efficiency of the present joint operations.

It is worth while to add that the savings from joint operations mentioned above is the minimum figure accepted by the Commission. In addition, there were other estimated losses based upon the judgment of men of experience that relate to consumers' accounting and collection, sales promotion expense and administrative and general expense. The Commission did not deny the existence of additional savings in these categories but said that the estimates were excessive and therefore rejected them without finding the correct figures. The conclusion of the writer is that there was no substantial evidence to warrant the finding that there would be no loss of substantial economies in the separation of the gas from the electric utility system of Virginia, and that the order of the Commission in this respect should not be sustained.

*Gulf States Gas System as an Additional System.*

Similarly, the Commission made the ruling, said by it to be advisory, that the Gulf gas properties could not be retained as an additional system to Gulf States as the principal system of Engineers. Conformity with standards (B) and (C) was conceded but it was held that the gas system did not conform to standard (A) relating to the loss of substantial economies from independent operations. Gulf States gas system owns facilities for the distribution and sale of natural gas in Baton Rouge and its surroundings. Gulf States acquired the properties by merging with the Baton Rouge Electric Company in 1938 which owned gas, electric and transportation properties that had been operated under a single management since 1900. The evidence indicated that the savings from the joint use of personnel and property amounted annually to $52,450 and that the additional cost of operating as an independ-

ent gas company would be $42,024. Of the latter sum the Commission held that $25,000 had been proved, so that the undisputed evidence showed that the separation of the systems would result in an annual loss of at least $77,000. In 1940 the gross receipts from the gas business were approximately $720,000 and the property account on the books was $1,675,000 as compared with approximately $10,840,000 and $57,770,000 respectively for the Gulf States. In the opinion of the writer the admitted facts establish the retainability of the Gulf gas system as an additional system, if Gulf States is chosen as the principal system.

*Other Business Clauses of Section 11(b) (1).*

An integrated public utility system such as Engineers not infrequently includes important subsidiary corporations which are not electric utility or gas utility companies and therefore are not, in the statutory sense, public utility companies which under certain circumstances may be retained as additional systems. These other businesses, however, may also be retained if the Commission finds that they conform with the other business clauses of § 11(b) (1). The Commission has given a restrictive interpretation to these clauses and so applied them to the Engineers system as to give rise to controversial questions which we now consider.

Each holding company is required by § 11(b) (1) to take such action as the Commission shall find necessary to limit the operations of the system "to a single integrated public-utility system, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system". The section then contains the proviso that permits additional integrated public utility systems if they conform to the standards in paragraphs (A), (B) and (C) which we have discussed. After this proviso comes the following paragraph which is descriptive of the other businesses that the holding company may retain: "The Commission may permit as reasonably incidental, or economically necessary or appropriate to the operations of one or more integrated public-utility systems the retention of an interest in any business (other than the business of a public-utility company as such) which the Commission shall find necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of such system or systems."

In the earlier case of The United Gas Improvement Co., 9 S.E.C. 52, decided April 15, 1941, the Commission held that these two clauses must be read together, saying (p. 73): "We must conclude that the two clauses in Section 11(b) (1) which refer to the retention of other businesses, when taken together, mean that the Commission *must* permit the retention of other businesses, including investment interests in utilities not subsidiaries, which are found to be reasonably incidental or economically necessary or appropriate to the operations of an integrated public utility system retainable under the control of the holding company, and that as to both investments in non-utilities and interests in non-utilities sufficient to create the statutory parent-subsidiary relationship, these standards may be met if the retention of the investments or other interests is found to be necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of such system or systems." (Italics supplied)

If the phraseology of the concluding clauses of the section is given its ordinary meaning, it would seem that any business—other than that of a statutory public utility company—is retainable in the principal system if the Commission finds it "necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of such systems"; in other words, if the business is not detrimental to the system, retention must be permitted if it serves the interest of the public *or* of the investors *or* of the consumers—any one of the three. But, in the pending case and in the case of The North American Co. (affirmed North American Co. v. Securities & Exchange Commission, 2 Cir., 133 F.2d 148, 152), the Commission has refused to accept these concluding words as a gloss completely explanatory of the prior phrase which directs the retention of "such other businesses as are reasonably incidental or economically necessary or appropriate to the operations of such integrated public utility systems". In its opinion in the pending case the Commission said:

"* * * But these provisions do not contain isolated standards. They are a

closely knit part of a statute which has a clearly expressed policy, and they appear in a section of that statute which is designed to limit the operations of a holding company system to a single integrated public utility system and to reasonably incidental or economically necessary or appropriate non-utility businesses. In applying the statute, therefore, it must be remembered that the phrases 'public interest,' 'protection of investors or consumers' and 'detrimental to the proper function of such system' not only illuminate the meaning of 'reasonably incidental or economically necessary or appropriate' but themselves derive content from their context in the section and the statute.

Moreover, Congress did not say that 'the Commission shall permit the retention of a business which it finds to be necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of such system or systems.' Rather it instructed us to examine these factors in determining whether a business is retainable as *reasonably incidental or economically necessary or appropriate to the operations of an integrated utility system.*

The questions before us, therefore, are not merely, as respondents suggest: Is the retention of this business appropriate for the protection of investors? or, Is the retention of this business appropriate in the public interest? or, Is the retention of this business detrimental to the proper functioning of an integrated utility system? Rather, our fundamental inquiry is: Having in mind the protection of investors, the public interest and the proper functioning of an integrated utility system, is the retention of a particular non-utility business reasonably incidental or economically necessary or appropriate to the operations of a retainable utility system? The questions suggested by respondents are thus relevant in attempting to resolve the ultimate issue but they do not exhaust the scope of our inquiry."

In fine, the Commission reverts to the prior phrase and holds that it must deny retention of any "other business" unless it is incidental or necessary or appropriate to the *operations* of the principal system, i.e., unless there is a functional relationship between the operation of the business and the operation of the principal system. For example, the Commission rules that a street railway and bus transportation business is not retainable as an "other business" by Virginia Electric & Power Company, but an ice business is retainable, because the transportation business is not functionally related to the operation of the public utility system but the ice business is so related since it serves to heat a service building of the Electric Company in the winter and cool it in the summer.[2]

It seems clear to us that Congress did not contemplate this result, but intended, on the contrary, to forbid the divestment of other businesses, not detrimental to the functioning of the principal system, if retention will serve the interests of the general public or the interests of investors or consumers, irrespective of the functional relationship between these businesses and the principal system. The purpose to eliminate the evils of holding company systems is expressed in the Act in unmistakable terms, but in the provisions of the compromise measure, worked out in the legislative process, it also clearly appears that Congress realized that it was dealing with existing corporate structures that had been operated under common control for a long time and could not be cut down to a single ideal system in every case without disastrous consequences to public and individual interests. The purpose to protect these interests is made abundantly clear by an examination of the legislative history of the Act.

When the Senate Bill (S. 2796) was reported favorably to the body, it embodied a requirement appended to § 11(b) (1) that holding companies retain only "such business as is reasonably incidental or econom-

[2] The concluding "other business" clause in § 11(b) (1) begins with the words "The Commission may permit, &c.", which seemingly indicate a permissive authority rather than a mandatory duty. The word "may" however, was given the meaning of "must" by the Commission in its decision in the case of United Gas Improvement Company, supra; and this interpretation is not seriously challenged by the Commission in its present decision which introduces the theory of functional relationship. If the Act is interpreted as giving the Commission a broad discretion to forbid the retention of other businesses that are not detrimental to the functioning of the system, and are necessary or appropriate to the interest of the public or of investors or of consumers, doubtful questions of constitutionality may arise.

ically necessary or appropriate to the operation of such system," that is, substantially the same language as is now contained in the first "other business" clause of the section. During the debate an amendment was offered by Senators Minton and Johnson in order to enable an electric public utility system to retain a water utility company or a business consisting solely of owning and operating farm lands for experimental work in agriculture. When the bill came before the House it was liberalized by the insertion of a clause in general terms which prohibited the Commission from directing the divestment of any business unless the Commission should find that retention was inconsistent with the public interest. The Conference Committee substituted the language now found in the second "other business" sentences at the end of § 11(b) (1), and this was accepted as satisfactory by the Senate (as well as the House) without comment or objection. Obviously the language was regarded as broad enough to permit the retention of such other businesses as Senators Minton and Johnson had in mind when they offered their amendment.

Moreover, the other business clauses of § 11(b) (1) were given this interpretation by the Commission In the matter of American Waterworks & Electric Co., Inc., 2 S.E.C. 972, 983-985, decided December 30, 1937, wherein a holding company which controlled electric utility companies and gas utility companies was permitted to retain other businesses, such as waterworks, coal, appliance sales, electric railway and bus transportation and bridges. The operations of the company extended over an area 300 miles square in Pennsylvania, West Virginia, Ohio, Maryland and Virginia. The assets amounted to $385,000,000 and the annual earnings to $52,000,000. There was evidence of economies from the joint use of personnel and facilities and retention of the other businesses was permitted although there was no functional relationship between them and the other companies in the system.

The general purposes of the Act will not be frustrated by this interpretation. The Commission has the power and duty to determine whether the interests of the public or of investors or of consumers will be served by the retention of other businesses, and even if it so finds, it must nevertheless require the severance of the other businesses from the system if it further finds that the combination is detrimental to the proper functioning of the system. If all of these findings are favorable to the continuance of the combination, the practical advantages shown by experience to flow from joint operation may still be enjoyed.

*Retention of Virginia Transportation Business under the Other Business Clauses.*

The application of the Commission's interpretation of the other business clauses of § 11(b) (1) is shown by the provisions of the order which require Virginia Electric & Power Company, as the principal system to be retained, to divest itself of control of its transportation system, consisting of street railway and bus service in Richmond and Norfolk, bus service in Portsmouth and Petersburg, and interurban bus service between Richmond and Petersburg. These activities constitute practically the whole transportation services in these communities. In 1940 the investment was approximately $13,500,000 and the gross operating revenues were approximately $5,000,000. The Commission's order was based for the most part upon the lack of functional relationship between the transportation and the electric utility business in accordance with the theory developed in the quoted passage from its opinion. Moreover, this theory greatly influenced the Commission's findings of fact in respect to the retainability of other businesses associated with public utility systems in this case, as will appear from the following excerpt from its opinion: "The existence on the one hand of a long historical association, or on the other hand of joint personnel and facilities or net returns is perfectly compatible with a combination whose components are not even remotely incidental, or economically necessary or appropriate, although owned and operated under common control."

Again the Commission said, quoting from its opinion in the case of the North American Co.:

"By the same token, the 'substantiality and stability of income' afforded by non-utility interests is not, in and of itself, a factor warranting their retention in a public utility holding company system. Substantial and stable income might be afforded by businesses having no imaginable relationship to the economy of management and operation of integrated public utility systems. If the 'other business' clauses of Section 11(b) (1) are not to be removed

from their statutory context, and if we are to give full weight to the express standards and the policy of the Act, we cannot find that any business is 'reasonably incidental, or economically necessary or appropriate' to the operations of an integrated public utility system or is 'not detrimental to the proper functioning' of such a system merely because it is profitable.

"The same considerations apply to economies resulting from joint use of personnel. Unless the non-utility business is such that resulting economies are economies in the operation of an integrated utility system or systems, the mere showing of economies is of little weight in determining whether the non-utility business may be retained."

It was from this point of view that the Commission weighed the evidence with respect to the relation of Virginia's transportation business to its electric utility business and the effect of their severance upon consumers, investors and the general public. The evidence tended to show the following facts: The union of the transportation and electric businesses was a historical outgrowth which began in 1909 with the incorporation of Virginia as a railway company with the incidental statutory power to engage in electrical utility operations. From 1909 to 1922 the transportation business was the predominant factor but gradually the importance of the electric utility operations increased until in 1922 they exceeded the transportation operations. Since 1922 the transportation revenues have remained almost stationary while the electric revenues have grown until in 1940 they had become about 75 per cent of the whole.

The joint operation of the businesses has been conducted with the permission of the State of Virginia and has been efficient and advantageous to consumers. There has been joint use throughout of personnel and property; 13.8 per cent of the transportation employees also perform services for the electric department and a total of 305 employees ranging from executives to minor employees render service to both systems. Joint use is made of property of the value of $2,750,000 which includes office buildings, storage facilities, automotive equipment, poles, manholes, rights of way, &c. The transportation system derives all of its electric energy (at a cost in 1940 of $218,000) from the electric department which has provided special facilities for that purpose. The transportation department furnished free transportation to electric employees to the extent of $108,000 in 1940.

The trolley service has gradually declined and the bus service has gradually grown until it is now slightly over 50 per cent of the whole. The railway system in 1940 received gross operating revenues of $2,447,-000 but a net operating deficit of $43,000. The bus properties received gross operating revenues of $2,580,000 and net operating revenues of $151,000 so that the gross income (after depreciation) from the transportation department was $106,000. The net income in 1940 was $24,800. For years the transportation operations as a whole have produced a regular but small annual net profit. Studies offered by accountants indicated economies from joint operation amounting to $249,000 a year, of which $108,000 was credited to free transportation allowed electric employees. The Commission doubted whether a saving was actually made through the free transportation service.

There was also evidence tending to show that a divorcement of the transportation business would involve a considerable loss to the Virginia system since the realizable figure would necessarily be small and the salvage of capital investment which Virginia is now making on its operations through the allowance of annual depreciation would be lost.

From this outline it appears that substantial evidence was presented from which the Commission might have found that the retention of the transportation business was necessary in the public interest or for the protection of investors or consumers, or if not necessary, at least appropriate for these purposes in the ordinary acceptation of these terms; but in the absence of functional relationship between the transportation business and the electric system, no such finding could be made under the Commission's interpretation of the Act. Moreover, the Commission gave as an additional reason for ordering the divestment of the transportation business that the coexistence of the properties under one ownership had been detrimental to the proper functioning of the electric system and adverse to the interests of consumers and investors because much of the property had been carried in the electric plant account and insufficient charges against the transportation business for electrical energy and other facilities furnished by the electric

system had been made. There was evidence that the accounting methods of the system had been incorrect in some respects; but during the course of the hearing it was shown that the accounting system was under examination by competent accountants who had made recommendations as to the allocation of joint expenses and interdepartmental services which would correctly reflect these operations. The accounts for the operations in the year 1940 were adjusted to meet these recommendations and the accountants were directed to put the new methods into effect. The Board made no specific findings as to the effect of the change saying merely that "it is not clear that the changes completely eliminate the improprieties."

In view of this situation it seems fitting that the matter of the retention of the transportation business be given further consideration by the Commission. It is not the function of this court to make final determinations of fact; that responsibility lies with the Commission under the statute. Its conclusions on this branch of the case were based mainly upon the theory that the other businesses must bear a functional relationship to the system and to a less degree upon its finding that the retention had been detrimental to the system in the past. The first reason, as we have seen, is based on an erroneous interpretation of the Act, while the second relates to past accounting practices with no clear finding as to present conditions. The association of the businesses in combination in the Virginia Electric Power Company, serving the same locality under the supervision of the State authorities, does not appear to have involved the major evils which the Act was designed to eradicate. Historically the combination came about in the normal development of the business of furnishing electric power. The faulty accounting practices which have occurred are not necessarily inherent in the situation and have either been corrected or are in process of correction, according to the undisputed evidence. For these reasons we conclude that so much of the Board's order as relates to the divestment of the transportation business from the Virginia Electric Power Company should be reversed and the case remanded to the Commission for further findings and conclusions.

A similar ruling would be required, if the court should pass on the findings of the Commission in regard to the other businesses which Gulf States and El Paso, respectively, desire to retain.

*Selection of a Principal System.*

In the foregoing discussion, it has been assumed for the most part that Virginia will become the principal system of Engineers. This may well be the case, but so far Engineers has made no selection and now contends that no suitable opportunity to make one has been given it. In 1941, after hearings, the Commission directed Engineers to divest itself of certain subsidiaries not connected with the present review and steps have been taken to that end. The Commission also held that Virginia and Gulf States, the most important subsidiaries of the system, severally constituted integrated public utility systems and that Engineers could not retain both under the one area interpretation but one of them must be selected as the principal system in order that the provisions of § 11(b) (1) might be applied. The Commission said that the choice between Virginia and Gulf States was a close one which it would assume that Engineers had the right to make provided it was made as promptly as possible.

The Commission recognized the difficulty of an intelligent choice until it had determined what additional systems and what additional businesses could be retained in combination with each of the two subsidiaries. The right of Engineers to require such preliminary determinations to be made was denied but nevertheless the Commission proceeded, in its discretion, to make advisory findings of the character indicated. Thereby Engineers was advised as to what properties it might retain in the event that either system should be chosen as the principal system. Engineers announced that it was not yet ready to make the selection and thereupon the Commission by its order of September 16, 1942 selected Virginia as the principal system, but granted permission to Engineers to ask, within fifteen days, for leave to substitute Gulf States as the principal system. Engineers then filed a petition for rehearing complaining, amongst other things, that fifteen days was insufficient for the purpose; and the Commission, on October 6, 1942, granted an additional fifteen day period to run from that date. Engineers still failed to make a choice and the selection of Virginia by the Commission as the principal system thereupon became

final. Since the case must be remanded to the Commission for further findings in accordance with this opinion, the action which the Commission has heretofore taken in respect to the selection of the principal system becomes immaterial; but as the selection of a principal system is essential to any simplification of the corporate structure of Engineers, the legal question involved must be decided.

The statute is silent on the point. It provides only that it shall be the duty of the Commission to pass its simplification order as soon as practicable after January 1, 1938, § 11(b) (1); and that such an order shall be complied with within one year from its date; but the Commission, upon a proper showing of due diligence by the holding company, may extend the time for an additional year if it finds such extension necessary or appropriate in the public interest or for the protection of investors or consumers, § 11(c). No standards governing the choice of a principal system are set up in the Act.

It is a reasonable interpretation that the holding company rather than the Commission has the right of choice, since the holding company is the lawful owner of the combined properties and the public interests are protected by the grant of power to the Commission to determine what integrated public-utility systems are involved in a given case and what additional systems and additional businesses may be retained therewith under the terms of the statute. The statutory purposes are not impeded by this interpretation and the contention is avoided that the delegation of arbitrary power to the Commission to select the principal system without Congressional standards to guide it would be unconstitutional. While the point was not specifically decided, it was assumed by the Commission in the pending case and by the court in North American Co. v. Securities and Exchange Comm., 2 Cir., 133 F.2d 148, 151, that in the first instance the privilege of selection belongs to the holding company.

It does not follow that the holding company may delay the selection unreasonably and thereby interfere with or prolong the administrative process. On the contrary, the duty imposed upon the Commission to simplify the corporate structure of the holding company system implies the power to require the holding company to make the selection seasonably, and in case of unnecessary delay, to make the selection itself. However, if selection cannot be made intelligently by the holding company until the permissible composition of alternate systems has been determined, the Commission should make advisory findings as it has done in the pending case. These findings must now be reconsidered in the light of the interpretation of the several provisions of § 11(b) (1) herein set out; and this procedure need not unduly delay the final disposition of the case since the pertinent evidence has already been taken.

Engineers contends that the right of selection may be exercised by it at any time within the year allowed by the Act for compliance with the Commission's order, that is, the selection must be made and the order put into effect within the year unless the Commission allows additional time for good cause shown. A contrary ruling was made in North American Co. v. Securities & Exchange Commission, supra, on the ground that such deferment of selection would cause unnecessary delay, presumably because it would necessitate alternate findings by the Commission. This reason would obviously not apply when, as in the pending case, alternate findings are essential to a choice. In such event selection of one of the alternatives and compliance with the order of the Commission in regard thereto within the year would occasion no unnecessary delay.

For present purposes, it is sufficient to decide that the right of selection lies with the holding company; that the right must be exercised without unnecessary delay; that the Commission should make preliminary rulings if they are necessary to enable the holding company to make its selection; that if the holding company does not make its selection in a reasonable time the Commission may designate the principal system; and that the action of the Commission in passing upon the need of preliminary findings and in fixing the time within which the selection of the principal system must be made should not be disturbed by the courts unless it appears that the holding company has been denied a reasonable opportunity to make its choice.

*The Excluded Evidence Relating to the Constitutionality of Section 11(b) (1).*

The constitutionality of the Public Utility Holding Company Act was sustained in North American Co. v. Securities & Exchange Commission, supra, and a writ

of certiorari was granted by the Supreme Court on March 1, 1943, 318 U.S. 750, 63 S.Ct. 764, 87 L.Ed. ——. See, also, the Commonwealth & Southern Corp. v. Securities and Exchange Commission, 3 Cir., 134 F.2d 747. We concurred in the views expressed in this case in Central & South West Utilities Co. v. Securities and Exchange Commission, — U.S.App.D.C. —, 136 F.2d 273, decided June 7, 1943. In the pending case Engineers offered and the Commission excluded evidence of an economic and statistical character purporting to show that the standards set out in § 11 (b) (1), relating to the control of subsidiaries by holding companies and to the size of holding company systems, bear no relation to the abuses that Congress listed in § 1 of the statute and intended to eliminate. It is contended that the proffered evidence conclusively shows the absence of such a relationship and hence the divestment provisions of § 11(b) (1) are wholly arbitrary and capricious and beyond the Congressional power. The pending case is thus distinguished from the last cited cases in which no evidence bearing on the reasonableness of the section was introduced.

The Commission excluded the evidence on the ground that an administrative body has no authority to weigh evidence of the character described or to pass upon the constitutionality of the Act which it is called upon to administer. It had previously ruled that it has no power to decide constitutional questions in Houston Natural Gas Corp., 3 S.E.C. 664, 671; Walston & Co., 5 S.E.C. 112, 113; J. A. Sisto & Co., 7 S.E.C. 647, 653, note 5.

This court decided in Panitz v. District of Columbia, 72 App.D.C. 131, 112 F.2d 39, that a tax assessor, as an administrative official, has no inherent power to rule on constitutional objections to the tax. We said: 72 App.D.C. at pages 133, 134, 112 F.2d at pages 41, 42.

"* * * It has been said that the necessities of our system require the judiciary to determine the constitutionality of Acts of the legislature. There can be little doubt that it represents the highest exercise of judicial power, and one that even the judiciary is reluctant to exercise. Interruption of the machinery of government necessarily attendant on this function not only cautions the judiciary but argues as well against its exercise by other agencies. It is this consideration for the orderly, efficient functioning of the processes of government which makes it impossible to recognize in administrative officers any inherent power to nullify legislative enactments because of personal belief that they contravene the constitution. Thus it is held that ministerial officers cannot question the constitutionality of the statute under which they operate. Likewise, it has been held that an administrative agency invested with discretion has no jurisdiction to entertain constitutional questions where no provision has been made therefor. In respect to taxation it is frequently stated that one need not pursue his administrative remedy where the tax is void. Here again is apparent a reluctance to invest non-judicial agencies with jurisdiction to rule on the validity of statutes.

"From the above we think it clear that the assessor had no inherent authority to consider constitutional objection to the tax."

See, also, Fosgate Co. v. Kirkland, D.C. S.D.Fla., 19 F.Supp. 152.

No statutory power is conferred by the Public-Utility Holding Company Act upon the Commission to consider questions of constitutionality or to receive evidence or make findings of fact in respect thereto. Section 24 of the statute provides that "the findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive"; but these findings are obviously those which the Commission must make in the administration of the Act and they do not relate to evidence offered to show that the Act is entirely invalid because it lacks the factual basis for the constitutional exercise of the Congressional power.

It is true that an administrative agency must sometimes pass upon constitutional questions of fact in deciding whether it has jurisdiction to apply a statute to a particular individual under a particular state of facts, as in National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 81 L.Ed. 921, 108 A.L.R. 1352, Washington, V. & M. Coach Co. v. National Labor Relations Board, 301 U.S. 142, 57 S.Ct. 648, 81 L.Ed. 965 where the contention was made that since the employer was engaged in intrastate commerce, the Labor Act did not apply. In these cases the Board made findings of fact which indicated that the employer was engaged in interstate commerce and this conclusion was sustained by the

court since it was based upon substantial evidence. Moreover, a federal District Court has no jurisdiction to enjoin the Labor Board from holding a hearing and deciding whether the jurisdictional facts exist when the charge is that an employer has been engaged in interstate commerce and has been guilty of unfair labor practices under the Labor Act. 29 U.S.C.A. § 151 et seq. The power to prevent any person from engaging in unfair labor practices affecting commerce has been vested by statute in the Board subject to review by the Circuit Court of Appeals, and since the employer has thus been given adequate protection against illegal action on the part of the Board, no injunctive action by the District Court is necessary or proper. Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638.

These decisions, however, were required to protect the power of the administrative agency and to prevent interference with the performance of its functions in the application of the statute to the facts of particular cases. There has been no decision which holds that an administrative agency must receive evidence offered to show that its governing statute is invalid, or which empowers the reviewing court to direct the agency to take such testimony or make findings of fact upon it. For the foregoing reasons we are of the opinion that the action of the Commission in excluding the offered testimony must be affirmed.

It does not follow that the petitioner is deprived of the well established right to test the constitutionality of the statute by showing that it is completely lacking in factual basis. We hold merely that the proffered evidence was not admissible at the hearing before the Commission, without prejudice to the right of the petitioner to raise the same question hereafter in such other manner as it may be advised. See the discussion on Introduction before Agencies of Evidence Bearing on Constitutional Issues, Pike & Fischer, Current Text, § 45-a, 22; The Presentation of Facts Underlying the Constitutionality of Statutes, 49 Harvard Law Review, 631; Davis, Evidence in the Administrative Process, 45 Harvard Law Review, 364, 402–10.

It is apparent from the foregoing discussion that certain portions of the orders under review are in accord with the statute, while other portions should be modified or set aside; but, as the final order should be complete in itself and cover all phases of the case, the Commission's orders of September 16, 1942 and October 6, 1942 will be set aside, and the case remanded to the Commission for further proceedings in accordance with this opinion.

Reversed and remanded.