**NORTH AMERICAN CO. v. SECURITIES AND EXCHANGE COMMISSION.**

No. 105.

Circuit Court of Appeals, Second Circuit.

Jan. 12, 1943.

Writ of Certiorari Granted Mar. 1, 1943.
See 63 S.Ct. 764, 87 L.Ed. ——.

79x(a), to review two orders made by the Securities and Exchange Commission in a proceeding initiated by it under section 11 (b) (1) of the Act, 15 U.S.C.A. § 79k(b) (1). The orders were entered on April 14, 1942 and June 25, 1942, respectively. The opinions of the Commission in support of them will be reported in the North American Company, 11 S.E.C. —— and ——.[1] The April order directed North American to divest itself of all its securities, with minor exceptions, other than those of Union Electric Company of Missouri and its subsidiaries (hereafter referred to as the St. Louis system). The June order denied North American's motion for leave to present further argument that the Commission lacks power to designate the particular system to be retained as its "single integrated public utility system." North American's petitions to this court raise questions as to the construction and application of section 11(b) (1) and challenge its constitutional validity.

The North American Company was organized in 1890 under the laws of New Jersey. Its principal office is in the City of New York, N. Y. Its business consists in acquiring and holding for investment stocks and other securities, principally in the electric utility field. It is the top holding company in a system containing 80 companies and operating in 17 states and the District of Columbia. At no time has it engaged in the business of managing the operations of its public utility operating subsidiaries, or selling them supplies, engineering services or the like. It has, however, furnished financial advice and assistance and sponsored the interchange of operating information among the subsidiaries. On February 25, 1937 North American registered under the Act,[2] and thus became "a registered holding company" within the meaning of section 11(b) (1). This section makes it the duty of the Commission, "as soon as practicable after January 1, 1938," to require each registered holding company to take such action as the Commission may find necessary to limit the operations of the holding company system to "a single integrated public-utility system, and to such other businesses as are reasonably incidental,

Sullivan & Cromwell, of New York City, (Charles E. Hughes, Jr., of New York City, of counsel), for petitioner.

John F. Davis, Sol., Milton V. Freeman, Asst. Sol., Roger S. Foster, Counsel, Public Utilities Division, David K. Kadane, Maurice C. Kaplan, and Jerome S. Katzin, all of Philadelphia, Pa., for respondent.

Before SWAN, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

This case is before us on petitions of the North American Company, filed pursuant to section 24(a) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. §

---

[1] The opinions may be found in C. C. H. Fed. Securities Law Serv., '43, § 75,-271 and § 75,297.

[2] Registration did not waive its right to future challenge of the validity of section 11. See Electric Bond & Share Co. v. S. and E. C., 303 U.S. 419, 435, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105.

or economically necessary or appropriate to the operations" thereof. A proviso permits a registered holding company "to continue to control one or more additional integrated public-utility systems" if they satisfy the requirements of clauses (A) (B) and (C) of the section. The orders complained of limit North American's operations to the St. Louis system. Such other facts as are required to be stated will appear in the course of our discussion.

■ The first matter for consideration is the petitioner's contention that it was premature for the Commission to proceed with forced divestment under section 11(b) (1) before it had made the studies and published its recommendations as required by section 30, 15 U.S.C.A. § 79z–4. The issue was presented by a motion, denied by the Commission, to hold the proceeding in abeyance pending publication of such recommendations. It is argued that Congress expected many holding companies, if given time and guidance, voluntarily to rearrange their affairs; the operation of section 11(b) (1) was postponed to give the time, and the Commission was instructed to supply the guidance by making public its recommendations of administrative standards in respect to the matters referred to in section 30; hence, the order of April 1942 was premature as no such guidance had been supplied. Whatever may have been the expectation of Congress as to voluntary readjustments, we can find nothing in the statutory language justifying a holding that the recommendations which the Commission is directed to "make public from time to time," are a condition precedent to invoking the procedure of section 11(b) (1) to compel integration. If completion of ex parte studies under section 30 were a prerequisite to action under section 11(b), it should equally be so to action under section 11(e) or under section 10(c) (1), 15 U.S.C.A. § 79j(c) (1). Since such studies and recommendations are apparently to be made "from time to time" throughout the life of the Commission, to hold that enforcement of other provisions of the statute are dependent on completion of the studies would defer their enforcement indefinitely. We cannot impute such an intention to Congress. If it be argued that enforcement as to a particular holding company should be deferred until a study has been made and recommendations published as to it, a sufficient answer is that the company must be accorded a hearing before integration can be ordered. We are satisfied that section 30 should be construed merely as an administrative direction to the Commission, not as a condition precedent to conducting a proceeding under section 11(b) (1). Compare United States v. Morgan, 222 U.S. 274, 32 S.Ct. 81, 56 L.Ed. 198. For a discussion of the specific point see Commonwealth & Southern Corporation, 11 S.E.C. ——.[3]

■ We now turn to the petitioner's contentions relating to the interpretation and application of section 11(b) (1). The first is as to selection of a single integrated public utility system to be retained (which may conveniently be called the "principal" system). The selection of a principal system must naturally precede any final determination of what "other businesses" are "reasonably incidental or economically necessary or appropriate to the operations of such" principal system, as well as what "additional integrated public-utility systems" the holding company is to be permitted "to continue to control." Where, as in this case, there are found to be several integrated public utility systems,[4] any one of which might reasonably be chosen as the principal system, is the choice to be made by the holding company or by the Commission? We may assume, without so deciding, that the privilege of selecting its principal system should, during preliminary stages of the section 11(b) (1) proceeding, be accorded the holding company. This was done and only after North American had refused to express a preference between the several integrated public utility systems, was the St. Louis system selected by the Commission as the principal system for retention. No contention is made that the Commission made an unreasonable selection or that the selection of a different system would be more beneficial to North American. Its argument is merely that it cannot now tell which two of the three systems (St. Louis, Cleveland and Wisconsin)

---

[3] C.C.H.Fed.Securities Law Serv., '43, § 75,285.

[4] The Commission found that the electric operations in each of the areas centering at St. Louis, Washington, Cleveland, Detroit and Wisconsin, respectively, constitute a single integrated public utility system within the meaning of the Act. North American's contentions in the aspect now under discussion are confined to the St. Louis, Cleveland and Wisconsin systems.

will be most marketable; that section 11(c) gives it at least one year for compliance with the divestment order; and therefore it may select its principal system at any time within the period allowed for compliance. We do not think the statute contemplates such deferment of selection. It would necessarily result in delays. The Commission's duty is to act under section 11(b) "as soon as practicable," and due diligence in complying with the order is prescribed by section 11(c). Nor do we see that deferment in selecting the principal system is necessary to adequate protection of a holding company against circumstances which may arise during the period allowed for compliance with the order. If changes occur in "the conditions upon which the order was predicated," the Commission is authorized by subsection (b) to revoke or modify any order previously made thereunder. Under the circumstances disclosed by this record we see no error in the Commission's selection of the St. Louis system as the principal system for retention.

■■■ It is next contended that the Commission erred in limiting North American to the retention of a single integrated system; that under the (A) (B) (C) standards of section 11(b) (1), properly interpreted and applied, it is entitled to retain as additional or secondary systems the groups of subsidiaries which constitute the Cleveland and the Wisconsin systems. The (A) standard requires a finding that the additional system cannot be operated independently "without the loss of substantial economies which can be secured by the retention of control" by the holding company. It has been the practice of North American to furnish financial advice and, on occasions, direct financial assistance to its subsidiaries, and to sponsor the interchange of statistics and operating information among them. Such practices, it is urged, have been of great value to the Cleveland and the Wisconsin systems and a discontinuance of their relations with North American will cause them the loss of "substantial economies." After considering these arguments and the evidence presented in their support, the Commission refused to find that the additional systems could not be operated independently without the loss of substantial economies. Whether economy is achieved by centralized control is always a doubtful question and one peculiarly fitted for decision by an administrative agency staffed by experts. On such an issue a court cannot review or reweigh the evidence. See Morgan Stanley & Co. v. Securities Exchange Commission, 2 Cir., 126 F.2d 325; section 24(a) of the Act, 15 U.S.C.A. § 79x(a). With the Commission's ruling that "substantial economies" means important economies and not merely something more than nominal, we are in accord.

■■■ The Commission also found that neither additional system met the (C) standard. But we need not consider the correctness of this ruling, nor the interpretation placed upon clause (B), because the failure to satisfy the requirements of Clause (A) precludes retention of the additional systems, since all three clauses must be satisfied to secure the right to retain more than the primary system.

■■■ North American complains that divestment has been ordered of its investments in three non-utility companies and that this has resulted from an erroneous construction of the "other business" clauses of section 11(b) (1). The section requires a registered holding company to limit its operations to a single integrated public utility system, "and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system." Then follows the proviso dealing with additional integrated public utility systems, and next comes the following provision:

"The Commission may permit as reasonably incidental, or economically necessary or appropriate to the operations of one or more integrated public-utility systems the retention of an interest in any business (other than the business of a public-utility company as such) which the Commission shall find necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of such system or systems."

The Commission interpreted these "other business" clauses to permit retention only when it affirmatively appears "that the public interest will be furthered by retention of a non-utility interest by reason of its relation 'to economy of management and operation' of a public-utility system or systems or 'the integration and coordination of related operating properties.'" This conclusion is consonant with the policy of

the Act expressed in section 1(b) (4), 15 U.S.C.A. § 79a(b) (4) which declares that "the national public interest" is or may be adversely affected "when the growth and extension of holding companies bears no relation to economy of management and operation or the integration and coordination of related operating properties." We agree with the Commission's interpretation. It is apparently not disputed that the three other businesses are unrelated to the operations of the St. Louis system. Consequently no error appears in ordering their divestment.

There remains for consideration the petitioner's attack upon the constitutional validity of section 11(b) (1). It is urged that under the commerce clause of the Constitution, Art. I, § 8, cl. 3, Congress does not possess the power it has sought to exercise by this section of requiring a registered holding company to divest itself of all securities other than those related to a single integrated public utility system. Many of North American's subsidiaries are engaged in interstate commerce, but the ownership of securities issued·by them does not of itself constitute engaging in interstate commerce; the ownership of property is characteristically an intrastate matter. Such ownership can be asserted to be subject to congressional regulation under the commerce clause only on the ground that it so affects interstate commerce as to make regulation of it an appropriate means to the attainment of a legitimate end. See United States v. Wrightwood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726; United States v. Darby, 312 U.S. 100, 118, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430. Counsel argues that section 11(b) (1) does not make such effect the test of its application; it assumes that the mere fact that a holding company has registered under section 5[5] of the Act indicates a sufficient relationship to interstate commerce to support the asserted power, and it provides for divestment orders without any specific finding by the commission or by a court that the company is engaged in interstate commerce or that interstate commerce will be adversely affected by retention of the securities it owns. But we think the necessity

for such specific finding is eliminated by the statutory scheme. Section 1 expounds the policy underlying the necessity for control of holding companies as defined in section 2(a) (7). It declares them to be affected with a national public interest because, among other things, "their practices in respect of and control over subsidiary companies often materially affect the interstate commerce in which those companies engage,"[6] and the extension of their activities over ₊many states makes difficult, if not impossible, effective state regulation of public utility companies.[7] It is further declared that the national public interest is or may be adversely affected when the growth and extension of holding companies bears no relation to economy of management and operation or the integration and coordination of related operating properties.[8] Section 3 provides administrative procedure by which a holding company can obtain exemption from any provision of the Act, if it and its subsidiaries are predominantly intrastate in character.[9] North American did not avail itself of this administrative remedy; nor does it now assert that it is entitled to exemption. On the contrary its activities and those of its subsidiaries clearly bring it within the class of holding companies which section 1 declares affect interstate commerce and require regulation. Hence the essence of the petitioner's argument comes down to the contention that the retention of securities, which section 11(b) (1) assumes to regulate, is a purely intrastate matter and beyond congressional power.

That the power of Congress to regulate interstate commerce extends to regulation through legislative action of activities intrastate which have a substantial effect on the commerce cannot be, and is not, disputed. In United States v. Darby, 312 U.S. 100, at page 120, 657, 61 S.Ct. 451, 460, 85 L.Ed. 609, 132 A.L.R. 1430, the court noted that in such legislation determination whether the intrastate activities have the prohibited effect on the interstate commerce, has sometimes been left to the courts, sometimes to an administrative tribunal, and "sometimes Congress itself has said that a particular activity affects the commerce * * *." The stat-

[5] 15 U.S.C.A. § 79e.

[6] Section 1(a) (4), 15 U.S.C.A. § 79a (a) (4).

[7] Section 1(a) (5), 15 U.S.C.A. § 79a (a) (5).

[8] Section 1(b) (4), 15 U.S.C.A. § 79a (b) (4).

[9] Section 3(a) (1) and (2), 15 U.S.C.A. § 79c(a) (1) and (2).

ute there under discussion, like the one now before us, belonged to the class last mentioned. In passing on the validity of that class of legislation the opinion states that "the only function of courts is to determine whether the particular activity regulated or prohibited is within the reach of the federal power." To what extent that power can reach has been very recently demonstrated by Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. ——, decided November 9, 1942. There it was held that a small farmer's production of wheat for his own use could be regulated under the Agricultural Adjustment Act of 1938, as amended, 7 U.S.C.A. § 1281 et seq., because in the aggregate the consumption of home-grown wheat by many small farmers affects the price and market conditions of wheat transported between the states. If the commerce clause has a sweep so broad as that, we cannot say that Congress has exceeded its power in regulating the ownership of securities by a holding company whose subsidiaries are engaged in interstate commerce.

▓▓▓▓ The final argument is that section 11(b) (1) violates the Fifth Amendment. The guaranty of due process demands only that the law shall not be "unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505, 511, 78 L.Ed. 940, 89 A.L.R. 1469. The object sought by the statute under consideration is the elimination of abuses in the public utility holding company field. It is argued that the divestment of securities required by section 11 is not a reasonable means to that end because it will involve a destruction of values. We do not think the argument can prevail. Congress did not think it could accomplish its object solely by regulating future transactions, although many of the provisions of the Act apply only to them. To eliminate existing conditions which adversely affect the public interest Congress considered it necessary to enact section 11. The means selected are clearly adapted to the end in view. The wisdom of the legislation and the appropriateness of the remedy chosen is not the concern of the courts. See Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 394, 60 S.Ct. 907, 84 L.Ed. 1263. Compelling the holding company to dispose of its securities is not the same as condemning

private property for public use without paying just compensation. Under section 11(c) the petitioner is given a year within which to comply with the order and may on proper showing obtain an additional period not exceeding one year. If divestment can be effected by distribution in kind, there may be no loss in values. If, as petitioner contends, such distribution will be impossible and a liquidation by sale becomes necessary, the process may be painful to its common stockholders, but we cannot say that the remedy selected by Congress is so unreasonable, arbitrary or capricious as to constitute taking property without due process.

Orders affirmed.