PANHANDLE EASTERN PIPE LINE CO.
v. SECURITIES & EXCHANGE COM-
MISSION (UNITED LIGHT & RAIL-
WAYS CO. et al., Interveners).

No. 13703.

United States Court of Appeals
Eighth Circuit.

Nov. 3, 1948.

454

Harry S. Littman of Washington, D. C. (John W. Scott, of Washington, D. C., and Robert P. Patterson and John S. L. Yost, both of New York City, on the brief), for petitioner.

Roger S. Foster, General Counsel, Securities and Exchange Commission, of Washington, D. C. (Harry G. Slater and Jerome S. Katzin and Meyer Feldman, all of Washington, D. C., on the brief), for respondent.

Donald R. Richberg, of Washington, D. C. (John Dern, of Chicago, Ill., Charles V. Shannon, of Washington, D. C., and Samuel H. Liberman, of St. Louis, Mo., on the brief), for interveners.

Before THOMAS, JOHNSEN and COLLET, Circuit Judges.

COLLET, Circuit Judge.

The Panhandle Eastern Pipe Line Company (Panhandle Eastern) by its Petition for Review of Orders entered by the Securities and Exchange Commission on November 19, 1947, December 30, 1947, and January 6, 1948, seeks to have those orders set aside.

The Panhandle Eastern owns and operates a natural gas pipe line from the Panhandle and Hugoton fields in Texas, Oklahoma and Kansas, running through those states and Missouri, Illinois, Indiana, Ohio and Michigan, serving many communities and distributing companies therein, and, of particular importance in these proceedings, the Michigan Consolidated Gas Company (Michigan Consolidated), a public utility which distributes natural gas in the City of Detroit and environs. Panhandle Eastern's principal office and place of business is at 1221 Baltimore Avenue, Kansas City 6, Missouri. On November 30, 1946, the Federal Power Commission issued a certificate of convenience and necessity to the Michigan-Wisconsin Pipe Line Company (Michigan-Wisconsin) to construct, as stated in Panhandle Eastern's Petition, a "competing" natural gas pipe line extending from Hansford County, Texas, to a gas storage field approximately 140 miles northwest of Detroit known as the Austin field. Competition with Panhandle Eastern at Detroit is predicated upon the anticipation that a connecting line will carry the gas from the Austin storage field to Detroit for delivery to Michigan Consolidated. The orders above referred to, made by the Securities and Exchange Commission which Panhandle Eastern seeks to have set aside, approved the financing of both the Michigan-Wisconsin pipe line from Texas to the Austin field and a line from that field to Detroit. In addition to its interest as a prospective competitor of Michigan-Wisconsin, Panhandle Eastern owns one thousand shares of stock in United Light and Railways Company and one thousand shares of stock

in American Light and Traction Company. The connection of those companies with these proceedings will appear from the following statement of the historical background of the present controversy.

Prior to 1940 the United Light and Power Company (United), a holding company, controlled the United Light and Railways Company (Railways), another holding company. Railways in turn controlled the American Light and Traction Company (American), still another holding company. American owned all of the outstanding common stock of the operating company, Michigan Consolidated above referred to; all of the outstanding common stock of the Madison Gas and Electric Company (Madison), an operating public utility furnishing gas and electricity in the City of Madison, Wisconsin; Approximately 99.5% of the outstanding common stock of the Milwaukee Gas Light Company (Milwaukee), an operating public utility furnishing manufactured gas to the City of Milwaukee and surrounding metropolitan area; and approximately 20.3% of the outstanding common stock of Detroit Edison. On March 8, 1940, and December 6, 1940, the Securities and Exchange Commission instituted separate proceedings under Sections 11(b) (1), 15 U.S.C.A. § 79k(b) (1) and 11(b) (2), 15 U.S.C.A. § 79k(b) (2) of the Public Utility Holding Co. Act of 1935 to determine what action should be taken by the United Light and Power Company system to comply with those provisions of that Act. The two proceedings were subsequently consolidated. As a result of those proceedings, United, like the proverbial Arab, folded up its tent and departed from the scene. Upon the dissolution of United, Railways became the top holding company. In its opinion of August 5, 1941, the Commission directed Railways to divest itself of its interest in American and American to dispose of all of its interest in properties located outside the area comprising Michigan and states adjoining Michigan. Since the Commission in the same opinion found that Michigan Consolidated constituted a single integrated utility system, the order in effect left American with only the one operating company, Michigan Consolidat-

ed, which, as stated, distributed natural gas in Detroit which it purchased from Panhandle Eastern. A plan of compliance was filed by Railways and American on November 1, 1944, in which they proposed to divest themselves of their interest in each other and Railways was to confine its holdings to other operating companies not here involved. There is no issue now concerning the plan as to Railways. The plan as filed provided for the liquidation and dissolution of American. The plan further provided for the creation of a new company—the Michigan-Wisconsin Pipe Line Company (Michigan-Wisconsin)—which was to construct the pipe line from Texas to the Austin field with a branch serving Milwaukee and to be owned by Michigan Consolidated, Milwaukee and Madison. The plan further provided for the use of proceeds of the sale of the Detroit Edison stock, held by American, in financing the new pipe line from Texas and from the Austin field in Michigan to Detroit. The Commission in memorandum opinions issued March 12, 1945, and June 2, 1945, emphatically concurred in the plan to liquidate and dissolve American on the ground that Michigan Consolidated did not need its services and Milwaukee and Madison could not be considered as a part of an integrated system with Michigan Consolidated. It expressed the view in the June 2, 1945, opinion that a portion of the Detroit Edison stock owned by American might be sold for cash and the proceeds turned over to Michigan Consolidated to assist the latter in constructing the new pipe line. On April 30, 1946, the Commission issued findings and a three-to-two opinion stating that the plan would be approved if amended to provide for the payment of a greater amount than the plan provided for the retirement of American's preferred stock. Before an order was issued two Commissioners resigned. The cause was set for reargument after the vacancies were filled, but before a decision was rendered one Commissioner died and there has been no order issued on that plan.

With the approval of the Commission and in the light of the then contemplated liquidation of American, the Michigan-Wisconsin Company was organized. It ap-

plied to the Federal Power Commission for a certificate of convenience and necessity to construct the pipe line from Texas to the Austin storage field. That certificate, as heretofore stated, was granted November 30, 1946. The Panhandle Eastern filed a petition for a review of that order in the Court of Appeals for the District of Columbia. That court upheld the order of the Federal Power Commission. Panhandle Eastern Pipe Line Co. v. Federal Power Commission, U.S.App.D.C., 169 F. 2d 881. An application for certiorari was denied by the Supreme Court on October 25, 1948, 69 S.Ct. 81. Thereafter on June 26, 1947, Railways and American filed a new plan by which it was proposed that the new pipe line would result in bringing together Milwaukee and Michigan Consolidated into an integrated unit in a single area or region within the meaning of Section 2(a) (29) (B) of the Act[1] 15 U.S. C.A. 79b(a) (29) (B), and would justify the continued existence of American as a holding company for purposes contemplated by the Act. It was further proposed that the non-utility pipe line company Michigan-Wisconsin, The Milwaukee Solvay Coke Company (Solvay), (a non-utility subsidiary of Milwaukee manufacturing artificial gas for Milwaukee and coke and coke by-products which were sold to the public) and the non-utility Austin Field Pipe Line Company (Austin), (which was to construct the pipe line from the Austin storage field to Detroit), be retained in the American system as incidental and reasonably necessary "other businesses" retainable under the Act.[2] The proposal contained in the June 26, 1947, plan concerning the American's preferred stock which had been the cause of difference within the Commission theretofore is not now under attack. The plan further provided for the financing of Michigan-Wisconsin and Austin by American and the coordinated operation of Michigan Consolidated, Milwaukee, Michigan-Wisconsin and Austin with American as the holding company. The Commission approved the plan and issued findings, and opinion and orders carrying that approval into effect.

Panhandle Eastern assails the Commission's action upon the following grounds. First, it contends that the Commission made no affirmative finding that the plan to construct the pipe line from Texas to the Austin field was feasible and that there was no competent evidence that it was feasible. Second, that the evidence did not justify the conclusion of the Commission that Michigan Consolidated and Milwaukee could properly be retained by American as an integrated public utility system. Third, that there was no proof of, nor the required statutory finding that Michigan-Wisconsin, Austin and Solvay are such businesses as are reasonably incidental, or economically necessary or appropriate to the operations

---

[1] "(B) As applied to gas utility companies, a system consisting of one or more gas utility companies which are so located and related that substantial economies may be effectuated by being operated as a single coordinated system confined in its operations to a single area or region, in one or more States, not so large as to impair (considering the state of the art and the area or region affected) the advantages of localized management, efficient operation, and the effectiveness of regulation: Provided, That gas utility companies deriving natural gas from a common source of supply may be deemed to be included in a single area or region."

[2] "(b) It shall be the duty of the Commission, as soon as practicable after January 1, 1938:

(1) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such action as the Commission shall find necessary to limit the operations of the holding-company system of which such company is a part to a single integrated public-utility system, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system:

\* \* \* \* \* \* \*

"The Commission may permit as reasonably incidental, or economically necessary or appropriate to the operations of one or more integrated public-utility systems the retention of an interest in any business (other than the business of a public-utility company as such) which the Commission shall find necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of such system or systems."

of American as an integrated public-utility system within the meaning of Section 11(b) (1) supra. Fourth, that the Commission improperly approved the financing of the pipe line by American because there was no competent proof of the feasibility of such financing and no finding by the Commission that the acquisition of securities by American for that purpose would not be detrimental to the carrying out of the provisions of Section 11 supra. These contentions will be considered in the order stated.

In support of its first contention that there was no finding or justification therefor that the project was feasible, Panhandle Eastern says that (1) there is no substantial evidence that the Federal Power Commission has authorized the new pipe line project, and (2) that the operating forecast of the project upon which the Commission's action was based was not supported by competent evidence.

The argument that the record does not show that the pipe line project has been authorized by the Federal Power Commission is predicated on the fact that since the certificate of convenience and necessity was issued by the Federal Power Commission, Michigan-Wisconsin has changed the size and thickness of the pipe to be used with compensating changes in compressor installations, that Michigan-Wisconsin has not obtained authority from the Federal Power Commission to transport gas from the Austin storage field to Detroit, that only two of the thirteen compressor stations necessary for the full capacity operation of the line have been authorized by the Federal Power Commission, that no satisfactory schedule of rates has been submitted to the Federal Power Commission for approval, and that there is no finding or evidentiary justification therefor that the supply of gas available to the pipe line in Texas is sufficient to operate the line at full capacity.

The Commission (Securities and Exchange Commission) considered these questions in its findings and opinion of December 30, 1947, Holding Company Act of 1935 Release No. 7951. It found that the economic necessity of the pipe line was a matter for determination by the Federal Power Commission, that the entire plan to construct the line from Texas to the Austin storage field and to construct the line from the Austin field to Detroit was before the Federal Power Commission. That the latter had approved the merits of the Texas-Austin field line by the issuance of the certificate of convenience and necessity therefor on November 30, 1946, and had issued a second certificate on November 13, 1947, to the Austin Field Pipe Line Company (Austin) to operate the Austin storage field and to build a pipe line from that field to Detroit and other points in Michigan. The Securities and Exchange Commission further found that until the project was in complete operation the Austin line would be leased to Michigan Consolidated and used to transport gas delivered to Michigan Consolidated by Panhandle Eastern, in off peak periods, to the Austin field for storage as a reserve and return when needed by Michigan Consolidated in the Detroit area. After the Michigan-Wisconsin Texas line reached the Austin field and was connected to the Austin line, the Commission found that Michigan-Wisconsin would take over the operation of the Austin facilities. The Commission further stated that, although the entire project had not been approved by the Federal Power Commission at the time its findings and opinion were issued, "It is clear from a reading of the opinions of the Federal Power Commission, however, that the entire project is before it and that the necessary authorizations are to be sought as the need arises. The certificate to Austin expires on December 31, 1951, when Michigan Consolidated's contract with Panhandle terminates, while the Michigan-Wisconsin certificate is expressly conditioned on the filing of applications which will permit the Austin field and lines to be tied in with its operations. Similarly, the authorizations for installation of compressors are to be sought as they are required for the line." The Commission took note of Panhandle Eastern's argument that modifications had been made in the project since its approval by the Federal Power Commission and said, "In consider-

ing these objections, we observe at the outset that we have no authority to pass upon or question the validity of the Federal Power Commission certificates. Nor are we in any position to determine whether the project has so changed as no longer to qualify for the existing certificates. The four respects in which it is asserted that there has been a substantial modification in the project have been brought to the specific attention of the Power Commission by a motion for rehearing as well as in a more recent petition filed by Panhandle in the review proceedings to remand the case to the Power Commission. Unless and until the Power Commission alters or rescinds its certificates, or until the certificates have been declared invalid by competent court, we must assume for our purposes that they are valid and outstanding. Moreover, we note that at least some of the modifications listed above were before the Power Commission when it rendered its decision or since. We have adverted to the knowledge that the line was being redesigned for 24 inch pipe and to the fact that the FPC opinion expressly leaves the question of rates open. The possibility that the line would cost more than estimated was also considered by the Commission; and the adequacy of gas reserves and the deadlines imposed by conditions in the gas supply contracts were also known to the Commission when the certificates were issued."

These findings and conclusions are amply supported by the record before the Commission. And it was justified in concluding that the modifications made in the manner of construction did not invalidate the certificate of convenience and necessity issued Michigan-Wisconsin by the Federal Power Commission. Those conclusions find further support in the opinion of the Court of Appeals for the District of Columbia denying Panhandle Eastern's Petition for Review of the order of the Federal Power Commission granting the certificate to Michigan-Wisconsin. Panhandle Eastern Pipe Line Co. v. Federal Power Commission, supra. We find no merit in the argument that the project has not been authorized by the Federal Power Commission because of modifications of construction plans, that Michigan-Wisconsin has not or will not have authority to connect the pipe line from Texas with the Detroit market, that only a portion of the compressor installations has been authorized or that no schedule of rates has been submitted to the Federal Power Commission.[3]

On the question of whether there was a sufficient supply of gas available in the area of Texas dedicated to the use of Michigan-Wisconsin to operate the pipe line at full capacity, the Commission properly took the position that the "merits of the pipe line as such" was primarily a question for determination by the Federal Power Commission. As heretofore noted the latter Commission has approved the project and its action has been sustained by the Court of Appeals for the District of Columbia. But Panhandle Eastern contends that since the Federal Power Commission found that the supply of gas available was "adequate to supply and support the facilities which we find should be authorized" and in the certificate issued to Michigan-Wisconsin it only actually authorized two of the thirteen compressor installations provided for in the application and plan which would give the line an annual capacity of only 47 million Mcf., that the Federal Power Commission was thereby limiting its finding of availability of supply to 47 million Mcf. Upon that assumption Panhandle Eastern contends that the Securities and Exchange Commission could not properly assume that the Federal Power Commission granted its certificate to Michigan-Wisconsin upon the

---

[3] In Panhandle Eastern Pipe Line Co. v. Federal Power Commission, supra, [169 F.2d 883] the court said: "The Commission also provided that the authorized facilities 'shall not be used for the transportation or sale of natural gas subject to the jurisdiction of the Commission until Applicant submits to this Commission a schedule of rates and charges in a form satisfactory to this Commission providing for adequate and reasonable rates and charges consistent with the public interest.' The Act does not require, and because of changing costs it would be illusory to require, that rates be fixed before construction begins."

hypothesis that the amount necessary for full capacity operation—108 million Mcf.—would be available. Upon that premise the argument is based that the record does not show that the Federal Power Commission has authorized a 108 million Mcf. line. We do not believe the construction placed by Panhandle Eastern on the Federal Power Commission's findings is justified. In its formal finding issued November 30, 1946, it stated that it was neither necessary nor appropriate to then authorize the construction proposed beyond the requirements necessary to permit the commencement of the initial operations as contemplated in the application. In its opinion issued January 17, 1947, the Federal Power Commission states:

"Assuming such deliveries by Panhandle and assuming also that Applicant's project will be in operation prior to the expiration of the contract between Michigan Consolidated and Panhandle the total firm demands of all markets upon the Applicant's facilities during the first year of operation (assumed to be 1948 in this record) will be 45,716,000 Mcf. and a peak day delivery requirement during the first winter season of 276,000 Mcf. For the fifth year of operation, which will be after the expiration of the present contract with Panhandle, it was originally estimated that total annual sales would be 108,762,000 Mcf., of which 18,000,000 Mcf. would be sold on an interruptible basis and 90,726,000 Mcf. on a firm basis. On the basis of the testimony of the president of Michigan Consolidated as to additional markets for industrial sales in Michigan, firm requirements increase by 45,000,000 Mcf. to 135,-762,000 Mcf., interruptible requirements decrease from 18,000,000 Mcf., 5,000,000 Mcf., and total requirements are 140,762,000 Mcf. or 32,000,000 Mcf. more than originally estimated. Total peak day demand of firm sales in the fifth year was originally estimated to be 598,000 Mcf., but would be increased if the additional industrial sales indicated above were made on a firm basis. Further the record shows that contracts for the sale of natural gas to Michigan Consolidated Gas Company, Milwaukee Gas Light Company, Madison Gas and Electric Company, and Maryville Electric Light and Power Company cover at least 85 per cent of the sales to be made by Applicant in the fifth year of operation.

"Applicant's evidence as to available and potential markets was thorough, convincing and, we think, conservative. It was left substantially uncontroverted. For the purposes of our decision we accept such market estimates as reasonable and as sufficient to justify and support the proposed project in furtherance of public convenience and necessity of the general public in the areas proposed to be served.

"Gas Supply

"Applicant proposes to receive its supply of gas from certain portions of the Hugoton Field located in Oklahoma and Texas. Under the terms of a contract of December 11, 1945, with the Phillips Petroleum Company ("Phillips"), there is dedicated to the Applicant gas to be produced from acreage owned or controlled by Phillips in such field.

"The record shows that Michigan-Wisconsin prior to the hearing on its application, was advised by its geologist and principal witness on gas supply that it was desirable for it to augment its gas supply in order to insure fully the fulfillment of the requirements contemplated by Applicant under the proposed project. By reason of negotiations undertaken by Applicant additional gas acreage was dedicated to it.

* * * * * *

"We have carefully weighed the estimates in the record in order to reach conclusions as to the sufficiency of the gas supply committed to this project. In evaluating the evidence as to gas reserves it is not realistic to attempt a determination of the precise or exact volumes of gas available to a proposed project. Rather we are called upon to determine whether the available gas supply is sufficiently adequate to support the project for which a certificate of public convenience and necessity is authorized. Upon consideration of all of the evidence pertaining to gas supply in this record, we conclude that the gas supply available to Applicant and dedicated to the service Applicant proposes to render are adequate to supply and support the facilities which we find should be authorized."

On review of the Federal Power Commission's order, the court in Panhandle Eastern Pipe Line Co. v. Federal Power Commission supra, said: "The Commission did find, on sufficient evidence, that Michigan-Wisconsin 'has secured substantial reserves of natural gas and has submitted reasonable proof of the financial and economic feasibility of its projects.'"

The Federal Power Commission had before it the entire project. Its approval of the feasibility of the project cannot properly be limited to the "initial operations" thereof. Panhandle Eastern's contention that there was no finding or evidentiary basis for a finding that there was a sufficient supply of gas available to operate the pipe line at full capacity is without merit.

Panhandle Eastern contends that the operating forecast submitted by American showing the estimated cost and revenues of the project upon which it is asserted the Commission relied in determining the project's feasibility was not supported by competent evidence and should not have been admitted in evidence. The gravamen of the contention is that the representative of the engineering firm who made the estimate was ill at the time of the hearing and his superior, a senior engineer of the firm, under whose direction the estimate was made, identified the exhibit and undertook to testify as best he could concerning the source of and foundation for the underlying data. The witness frequently disavowed personal knowledge of the basis used in arriving at many of the estimates contained in the exhibit. The Commission took note of this same objection now being made to this evidence and in its opinion discounted the weight of the evidence,[4] not because of any question concerning the caliber or standing of the witness profession-

ally but because of his lack of personal knowledge concerning many of the items in the estimate. Under these circumstances we see no impropriety in admitting the exhibit in evidence for the limited consideration accorded it by the Commission.

■ The contention that the evidence did not support the Commission's finding and conclusion that Michigan Consolidated and Milwaukee could be retained by American as an integrated public utility system is without merit. The Commission had before it a plan of compliance for approval or disapproval. That plan proposed the construction of the pipe line from Texas to the Austin storage field. That field afforded a storage space in the ground for gas which could be accumulated in off peak periods and used for reserve during periods of peak demand. The Austin field was to be connected with Detroit and Ann Arbor, Michigan, by the Austin line which was a part of the project. Milwaukee, which does not have access to natural gas and now manufactures and sells artificial gas, was to be furnished natural gas by being connected with the Michigan-Wisconsin line from Texas at Milwaukee Junction near the Illinois State line. Solvay, a subsidiary of Milwaukee which now manufactures gas and furnishes it to Milwaukee was to be retained for the present as a standby source of supply for Milwaukee. American, the holding company, was to finance the project and after its completion furnish the integrated control and management. The Commission found that with the Michigan-Wisconsin and Austin lines in operation Michigan Consolidated and Milwaukee would constitute a single integrated public utility system;[5] that the substitution of natural gas for artificial by Milwaukee, the use of

---

[4] "We are satisfied that a sufficient basis was established for introducing the Ford, Bacon & Davis report into the record, although we recognize that it is entitled to only limited weight because of the method of its introduction."

[5] Panhandle Eastern contends there was no such finding. But the Commission stated:

"It is contended that the proposed pipe line will serve as a means of integrating Michigan Consolidated and Milwaukee and will render the continued existence of

American over these subsidiaries and the pipe line consistent with the standards of Section 11 (b) (1). If this contention is sound, the pipe line and the transactions incidental thereto may be regarded as providing an appropriate means of complying with Section 11 (b) which would satisfy the 'necessity' standard of Section 11 (e). We must, therefore, consider whether the pipe line will in fact result in the integration of Michigan Consolidated and Milwaukee and whether retention by American of the pipe line

the Austin field for storage purposes made possible by the construction of the Michigan-Wisconsin and Austin lines, and the operation of Michigan Consolidated and Wisconsin as a coordinated system, would result in substantial economies. It found that Michigan-Wisconsin, Austin and Milwaukee would constitute "other businesses" reasonably incidental, economically necessary and appropriate to the operations of the single integrated public utility system within the meaning of Section 11(b) (1) supra. It further found that such a coordinated system would not be so large as to impair the advantages of localized management, would promote efficient and economical operation and would not impair the effectiveness of regulation. Those findings are amply supported by the record. They fulfill the requirements of the first paragraph of Section 11(b) (1) and Section 2 (a) (29) (B) of the Act supra.

Panhandle Eastern contends that the Commission is without power or authority to anticipate the construction of the Michigan-Wisconsin or Austin line in determining whether an integrated system will exist but must deal with the holding company system as it exists and not as it may appear at some future time after the construction of a pipe line. Section 11(a) of the Act [6] and North American Co. v. Securities and Exchange Commission, 327 U.S. 686, 66 S. Ct. 785, 90 L.Ed. 945, are cited in support of that position.

■ Section 11(a) supra contemplates the examination of the corporate structure of a holding company and its subsidiaries in praesenti. The Commission examined the corporate structure of American and its subsidiaries in 1940 and as a result approved American's original plan to liquidate and directed it to do so. That liquidation was not effected for reasons which

---

and such subsidiaries will constitute a step in compliance with Section 11(b) (1). In that consideration we are not called upon nor do we have the power to determine the merits of the pipe line as such, for that matter is wholly within the jurisdiction of the Federal Power Commission and has already been decided in the affirmative.

"Section 11(b) (1), in so far as here relevant, requires the operations of a holding company system to be confined 'to a single integrated public-utility system,' and 'to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system.' Section 2 (a) (29) (B), in defining an integrated gas utility system, refers to the factors of substantial economies, localized management, efficient operation and effectiveness of regulation. Accordingly, in determining whether the pipe line will advance compliance with Section 11 (b) (1), it is necessary to consider at length, against the background of the statutory requirements of Section 11 (b) (1) and 2 (a) (29) (B), the relationship of the proposed pipe line to the operating subsidiaries which it is intended to integrate and the limits of the proposed project. We shall, of necessity, rely on many of the findings made by the Federal Power Commission in its determination that construction of the pipe line is a matter of 'public convenience and necessity' although, as the

discussion will indicate more fully, there have been some changes in the situation since those findings were entered and the authorization itself does not yet extend to the complete project which has been presented to us.

\* \* \* \* \* \* \*

"We conclude that a substantial showing has been made that the pipe line, when completed, will permit the coordinated operation of Michigan Consolidated and Milwaukee, \* \* \*

\* \* \* \* \* \* \*

"Having found that the proposals in the plan will enable Michigan Consolidated and Milwaukee to be regarded as an integrated gas utility system, we must now determine whether \* \* \*"

[6] "Sec. 11. (a) It shall be the duty of the Commission to examine the corporate structure of every registered holding company and subsidiary company thereof, the relationships among the companies in the holding-company system of every such company and the character of the interests thereof and the properties owned or controlled thereby to determine the extent to which the corporate structure of such holding-company system and the companies therein may be simplified, unnecessary complexities therein eliminated, voting power fairly and equitably distributed among the holders of securities thereof, and the properties and business thereof confined to those necessary or appropriate to the operations of an integrated public-utility system."

the Commission does not hold American culpably responsible for. It examined the corporate structure again when the new plan of compliance was filed. At that time the Federal Power Commission had authorized the construction of the Michigan-Wisconsin pipe line from Texas and had also authorized the construction of the Austin line. It found that these events materially changed the entire picture. That finding was justified. It was and is the pipe line project, as Panhandle Eastern says, which is the sine qua non of the plan. But it may not be said that the pipe line project was so illusory in December, 1947, that the Commission could not consider its construction in determining the propriety of the proposed plan of compliance. We find nothing in the statute nor in North American Co. v. Securities and Exchange Commission, supra, which militates against such action.

Panhandle Eastern contends that the economies which the Commission found would result from the coordinated operation of Michigan Consolidated and Wisconsin were economies which would result from savings accomplished by Michigan Consolidated and Milwaukee from the use of natural gas from Michigan-Wisconsin and hence were not economies contemplated by Section 2 (a) (29) (B), supra, flowing from the coordinated operation of Michigan Consolidated and Wisconsin. It is argued that such economies cannot possibly be those which are effectuated by "* * * gas utility companies * * * being operated as a single coordinated system * * *," since Michigan-Wisconsin and Austin are admittedly not gas utility companies. Again the pipe lines are the sine qua non. Without them Michigan Consolidated and Milwaukee could not be operated as a coordinated system. But with them the Commission with proper evidentiary basis therefor, found that significant and substantial economies would result from the coordinated operation of Michigan Consolidated and Milwaukee.[7] That finding meets the requirements of Section 2(a) (29) (B), 15 U.S.C.A. § 79b (a) (29) (B).

Panhandle Eastern asserts that it was error for the Commission to permit American to retain an interest in Michigan-Wisconsin, Austin and Solvay in the absence of proof and the finding required by the second paragraph of Section 11(b) (1)[8] that such businesses are *necessary or appropriate in the public interest or for*

---

[7] "The proposed pipe line system will result in an actual physical inter-connection between Michigan Consolidated and Milwaukee. The utilization of underground storage will enable the line to operate at full capacity the year round and permit significant economies in operation and cost. The proposed method of operation will make for close coordination between the operations of Michigan Consolidated and Milwaukee, with central control synchronizing these operations to assure maximum use of the lines, adequate pressures in the lines and in the storage fields, and allocation of gas to new customers in terms of line capacity and mutual needs.

"The record indicates that substantial economies will result from the pipe line. For one thing, an adequate supply of additional natural gas to Michigan Consolidated will save the large expenditures for manufactured gas now required during peak periods and will assure adequate supplies to the western districts which are threatened with a severe shortage. Conversion to natural gas by Milwaukee will make additional expansion of manu-

facturing capacity unnecessary and will bring in gas at a price which will enable that company to earn a fair return, while the consumers in Wisconsin will be benefited by a reduction in gas rates. And the availability of additional gas will permit natural expansion of demand. Thus the Federal Power Commission has found: 'The proposed project has a distinct and readily recognizable advantage over the ordinary interstate natural-gas transmission pipe line system. The advantage lies in the fact that the project combines the operations of a high-pressure pipe line with the utilization and operation of large gas fields for underground storage purposes. This combination of transport and large scale storage facilities makes possible important economies in operation, permits flexibility and superior reliability of service, and enables a high load factor operation of the main pipe line system.' (FPC Opinion No. 147, at mimeo, p. 11).

"The record indicates that these economies will be reflected in benefits to consumers."

[8] "The Commission may permit as rea-

*the protection of investors or consumers and not detrimental to the proper functioning of"* the integrated public utility system.

From what has already been said it should be clear that the record contains ample evidentiary basis for those findings. Certainly Michigan-Wisconsin and Austin are not only reasonably incidental and economically necessary to the operation of Michigan Consolidated and Milwaukee as an integrated public-utility system because as heretofore demonstrated the public-utility system could not be operated as a single system without those "other businesses". And, while Solvay may not be as vital to the operation of the coordinated system, yet there is ample justification for the

Commission's conclusion that at least for the present its retention by the public utility system is reasonably incidental and appropriate for the purpose of presently furnishing Milwaukee with artificial gas until the Michigan-Wisconsin line is completed and thereafter for standby purposes. The criticism is therefore narrowed to the question of whether the Commission made the finding called for in the italicized portion of Section 11(b) (1) above set out. The Commission took cognizance of the foregoing requirements of the statute and discussed the situation presented with reference thereto in its findings and opinion of December 30, 1947.[9] While the Commission did not summarize its findings re-

---

sonably incidental, or economically necessary or appropriate to the operations of one or more integrated public-utility systems the retention of an interest in any business (other than the business of a public-utility company as such) which the Commission shall find necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of such system or systems."

[9] "(2) Having found that the proposals in the plan will enable Michigan Consolidated and Milwaukee to be regarded as an integrated gas utility system, we must now determine whether Michigan-Wisconsin, Austin and Milwaukee Solvay, which are non-utility properties under the Holding Company Act and therefore not a part of the integrated system (see Cities Service Company, — S. E. C. — (1944), Holding Company Act Release No. 5028), may be retained in conjunction with the integrated system under the 'other business' clauses of Section 11 (b) (1).

"Section 11 (b) (1), in so far as here relevant, requires that the operations of a holding company system be limited '* * * to a single integrated public-utility system, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system * * *'. It is further provided that: 'The Commission may permit as reasonably incidental, or economically necessary or appropriate to the operations of one or more integrated public-utility systems the retention of an interest in any business (other than the business of a public-utility company as such) which the Commission shall find necessary or appropriate in the pub-

lic interest or for the protection of investors or consumers and not detrimental to the proper functioning of such system or systems.'

"We have held that these standards require a showing that the 'other businesses' sought to be retained are intimately related to the *operations* of the retainable public-utility properties. On the basis of the facts previously stated, we believe it is clear that the relationship between the two pipe line companies and the operations of what will become the 'integrated system' meet this test. As we have seen, the pipe line, in fact, is the integrating factor which will enable coordinated operation and bring about substantial economies in the system. We conclude that the pipe line companies may properly be retained as economically necessary and appropriate to the operations of the integrated system.

"Milwaukee Solvay is at present closely related to the operations of Milwaukee, supplying 68.23% of Milwaukee's manufactured gas. All of Milwaukee Solvay's production is devoted to Milwaukee, while its by-products are sold through usual trade channels. It is clear that Milwaukee Solvay is now economically necessary and appropriate to the operations of Milwaukee. However, once natural gas is available to Milwaukee, the function of Milwaukee Solvay will be changed. Applicants state that Milwaukee Solvay will then be held in a stand-by capacity in case of line failure or inadequate supply during periods of peak demand. In view of the manufacturing capacity of Milwaukee itself, which will also be retained for stand-by, there may be some question whether the production of Milwaukee Solvay will be needed and whether its operations will in time become completely disengaged from those of

lating to the necessity, appropriateness in the public interest, the protection of investors or consumers and the effect of the retention of these non-utility businesses on the functioning of the integrated public utility in the precise language of the statute, it is clear that the Commission intended to and did find these essential facts. The Commission surveyed the evidence on the need for the additional supply of gas to be furnished by the pipe lines and found that such need existed in the public interest. It found that consumers would benefit from the integration of the public utilities and the coordination therewith of the non-utility "other businesses". It found in no uncertain terms that the retention of these non-utility "other businesses" in the system was not detrimental thereto by finding that they were essentially useful. Those findings and those quoted in the footnote above answered the requirements of the statute as interpreted and construed in United Gas Improvement Co. v. Securities and Exchange Commission, 3 Cir., 138 F.2d 1010; North American Co. v. Securities and Exchange Commission, 2 Cir., 133 F.2d 148; and Engineers Public Service Co. v. Securities and Exchange Commission, 78 U.S.App.D.C. 199, 138 F. 2d 936; Cf. Wichita Railroad and Light Co. v. Public Utilities Commission, 260 U.S. 48, 43 S.Ct. 51, 67 L.Ed. 124; Atchison, Topeka and Santa Fe R. Co. v. United States, 295 U.S. 193, 55 S.Ct. 748, 79 L. Ed. 1382; Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446.

Panhandle Eastern's contention that the Commission improperly approved the plan of financing because there was no competent proof of the feasibility of such financing brings into the area of direct materiality to this action the evidence bearing upon the feasibility of the project. While the economic propriety—the merits—the necessity—for the pipe lines were primarily for the determination of the Federal Power Commission, the financial feasibility of the proposed plan was for the Commission to determine. That plan contemplated the investment by American of $25,000,000.00 in Michigan-Wisconsin for use in constructing the pipe lines. Already, with the approval of the Commission, it has invested a substantial part of an authorized $4,000,000.00 investment in the project. American has been directed to divest itself of its interest in Detroit Edison. From the sale of stock it owns in that company will be derived funds for use in the pipe line project. That investment will be in the common stock of Michigan-Wisconsin. The tentative financing of Michigan-Wisconsin (in "actual capital")[10] as proposed is to be as follows:

$25,000,000 Common Stock
50,000,000 3¼% 20 Year First Mortgage Bonds
10,000,000 2½% 6 Year Serial Notes
14,000,000 5% Preferred Stock

---

$99,000,000.

---

Milwaukee. For these reasons, while we find Milwaukee Solvay, on the basis of the facts now presented, economically necessary and appropriate to the operations of Milwaukee, we will reserve jurisdiction to reconsider this question if and when it appears that there has been a substantial change in the relationship of Milwaukee Solvay to the operations of Milwaukee.

"We conclude that, if the proposed pipe line project is completed and operated in substantially the manner now proposed, the public utility properties of Michigan Consolidated and Milwaukee will form an integrated system within the definition of Section 2 (a) (29) (B), and that Michigan-Wisconsin, Austin and Milwaukee Solvay, the non-utility properties, can be retained together with the integrated system under the standards of

Section 11 (b) (1) of the Act. From what has been said with respect to the benefits flowing from coordinated operation of these properties, it is of course clear that continuance of American as the holding company to keep these properties under common control would be consistent with the Act.

"Since the proposed pipe line would bring about the integration of the two operating companies and justify the continuance of American and thereby resolve its Section 11 (b) (1) problems under the Act, we find that the portions of the plan relating to the construction of the pipe line and the transactions incidental thereto provide an appropriate means of complying with Section 11 (b) and, therefore, satisfy the 'necessity' standard of Section 11 (e)."

[10] Commission's Opinion of December

The argument of Panhandle Eastern in substance amounts to this—that because the costs of construction of the pipe line project according to Panhandle Eastern's estimates was approximately $126,000,000 as compared to $104,000,000 in the estimate made by Ford, Bacon and Davis, the plan of financing proposed to and approved by the Commission was not feasible because the whole amount of the securities contemplated could not be marketed, and therefore the project would fail with the consequent loss to the stockholders of American of the $25,000,000 which the latter proposed to invest in the project.

The Commission is charged with abdicating its responsibility to pass upon the feasibility of the financing program by deferring to the managerial discretion of the utilities to go forward with the plan. The findings of the Commission demonstrate that it carefully considered the estimates of costs and revenues submitted by American and the estimates of costs of and revenues from the pipe line submitted by Panhandle Eastern. It further considered in detail the present and prospective market for the gas to be transported by the new pipe line. It concluded that even an approximation of the exact cost of the line was impracticable and impossible in view of the evidence of the changing and rising costs of construction. But it reached the further conclusion that all factors considered the plan of financing was not irrational nor unreasonable of accomplishment.

We glean from the Commission's findings that the rationale of this conclusion was that the demand for the additional source and quantity of natural gas being as great as it was that if the costs of construction of the pipe line advanced (as it

anticipated it would) the costs of competitive fuels would likewise advance making it practicable for the Federal Power Commission to fix a rate for the sale of the natural gas to be transported by the new pipe line at a figure which would be attractive on competitive grounds and at the same time would return a fair and appropriate rate of return on the investment costs of the project. The Commission did not base its approval of the financing plan upon the estimates submitted by American alone. It said, "However, for the purposes of this opinion we do not believe that it is necessary to make any findings on the exact cost of the project, even if such a finding were possible, or to decide which of the two estimates is entitled to greater weight. We recognize that the ultimate cost may be in excess of applicants' estimate; however, after consideration of both exhibits and the testimony pertaining to cost, we do not think it has been demonstrated that the project is not a feasible one."

We find no justification for a valid criticism of the Commission's action in this regard. It did not abdicate its duty and responsibility under the Act but found from an exhaustive inquiry into the subject that it was reasonable to assume that the entire project could be financed along the plan proposed.

It specifically authorized the investment by American of $25,000,000 in the common stock of Michigan-Wisconsin. It specifically reserved jurisdiction to modify the proposed capital structure of Michigan-Wisconsin as "the situation develops". And by "situation develops" it is clear that the Commission meant as the changing conditions developed.[11]

30, 1947. "The Ford, Bacon & Davis estimate of $104,530,800 as the total cost of the project, including Austin, was used as a basis for setting up a tentative financing schedule. Of the $104,530,800, the sum of $7,476,700 would be met by annual depreciation charges occurring in the years through 1952, when the line is to be in full operation, leaving $97,054,100 to be obtained in actual capital. * * *"

[11] "The responsibilities which have been delegated to this Commission by the Holding Company Act require that we view transactions of this sort to determine whether they conflict with the standards set forth in that Act. Objectors to the plan have pointed to the several uncertainties and obstacles to be overcome if the pipe line project is to be completed as presently planned and they urge that these uncertainties and obstacles are so important as to make any investment by American at this time improvident and imprudent. We have given these matters careful consideration. We think it apparent that there is a point at which a proposed investment

It is therefore apparent that the Commission did not base its conclusion of the feasibility of the proposed financing plan upon the estimate submitted by American which Panhandle Eastern claims was unsupported by proper evidence. It based its conclusion upon all of the evidence on the subject including the estimate submitted by Panhandle Eastern.

▆ The contention that the Commission's approval of the financing plan was without competent proof of its feasibility is without merit.

▆ Panhandle Eastern's contention that the Commission failed to find that American's acquisition of securities as proposed by the plan of compliance would not be detrimental to the carrying out of the provisions of Section 11 is also without merit. The contention is based on the requirement of Section 10 (c) (1), 15 U.S. C.A. § 79j (c) (1), which provides that the Commission shall not approve an acquisition of securities or utility assets which would be detrimental to carrying out the provisions of Section 11.[12] Section 10 (c) (1) does not require an affirmative finding. The finding of the Commission quoted heretofore in the margin [13] and the approval of the plan as a compliance with the provisions of Section 11 sufficiently answer this requirement of Section 10 (c) (1).

The orders of the Commission made on November 19, 1947, and January 6, 1948, are ancillary to the order of December 30, 1947, and present no question not hereinabove determined. Finding no ground for setting aside the Commission's orders, they are affirmed.

---

might so clearly appear to be imprudent and irrational that it would be our duty under the Holding Company Act, notwithstanding the management's decision to the contrary, to prohibit the proposed action. But we do not think such a case has been presented here. Every new economic venture is beset with difficulties at the outset, and an undertaking as large as the present one, with the numerous regulatory approvals required and competitive obstacles which must be overcome, is no exception. The decision to go forward under the circumstances is primarily for management to make. That decision has been made. Recognizing that there are real and substantial risks involved in the pipe line project, we do not think the management's decision can be regarded as irrational or without any reasonable basis and we find nothing in the Holding Company Act which warrants our interference with it. We conclude that the proposed investment of $25 million dollars in the common stock of Michigan-Wisconsin is consistent with the applicable provisions of the Act and it is therefore approved.

"We recognize that the senior financing program is a tentative one and that it may have to be altered to meet market conditions at the time the funds are sought. We also recognize that any increase in the cost of the project above present estimates will require some modification in the plans. In this connection, we emphasize again that we are not now approving any capital structure based wholly on a common stock equity of $25 million. The capital structure of Michigan-Wisconsin, as well as the adequacy of the common contribution, will have to be determined as the situation develops. It may well be that the common equity now contemplated will prove inadequate to support a properly proportional capital structure and may have to be increased. We do not consider that question to be before us at this time."

[12] "(c) Notwithstanding the provisions of subsection (b), the Commission shall not approve—

"(1) an acquisition of securities or utility assets, or of any other interest, which is unlawful under the provisions of section 8 or is detrimental to the carrying out of the provisions of section 11".

[13] "We conclude that the proposed investment of 25 million dollars in the common stock of Michigan-Wisconsin is consistent with the applicable provisions of the Act and it is, therefore, approved."